**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

CRAIG DULWORTH and
BRIANNA DULWORTH,

       Plaintiffs,

v.                             CIVIL ACTION NO. 1:22-cv-00469-JMS-MJD

EQUIFAX INFORMATION
SERVICES LLC; and
EXPERIAN INFORMATION
SOLUTIONS, INC.,

       Defendants.

---

**PLAINTIFFS' OPPOSITION TO EQUIFAX INFORMATION**
**SERVICES LLC'S AND EXPERIAN INFORMATION SOLUTIONS, INC.'S**
**JOINT MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

OVERVIEW ........................................................................................................6

FACTUAL BACKGROUND ...................................................................................7

LEGAL FRAMEWORK .......................................................................................12

I.   FCRA Provisions at Issue ........................................................................12

II.  Summary Judgment Standard ..................................................................14

ARGUMENTS AND AUTHORITIES .....................................................................14

I.   Genuine Issues Of Material Fact Exist As To The Accuracy Of Defendants' Reporting Of The Account ................................................................................................14

    A. Phantom Distinction Between Legal And Factual Questions Does Not Absolve Defendants Of Their FCRA Duties .......................................................14

    B. Defendants Also Cannot Rely On The "Bankruptcy Is Hard" Defense As A Reason To Habitually Violate The FCRA ...........................................................22

II.  Genuine Issues of Material Fact Preclude Entry of Summary Judgment on the Issues of Whether the Plaintiffs Suffered Actual Damages ........................................23

III. Genuine Issues Of Material Fact Exist As To The Reasonableness Of Defendants' Investigations Of Plaintiffs' Disputes .........................................................25

    A. Experian Conducted No Investigations At All Because It Improperly Decided—With No Real Evidence—That Plaintiffs' Disputes Did Not Come From Them ...............27

    B. Equifax Has Not Shown Its Investigations Were Reasonable As A Matter Of Law Because All Equifax Did Was Transmit The Disputes To Ally And Wait For Ally's Response ....................................................................................29

        1.   Regardless of what Ally was telling Defendants, they have their own FCRA obligations to investigate and verify information. ..........................................29

IV.  Defendants Have Not Shown As A Matter Of Law That A Jury Could Not Conclude They Acted Willfully In Violating Section 1681e(b) ................................................34

    A. Following The White Injunction Does Not Save Defendants As A Matter Of Law ........34

    B. Defendants Have Not Shown What Reading Of The FCRA They Adopted And Applied To The Reporting Of Plaintiffs' Ally Account ...............................................37

    C. Defendants Have Not Shown Willfulness Lacking As A Matter Of Law As To Their Perfunctory Investigations Of Plaintiffs' Disputes .......................................40

        1.   Experian has not proven as a matter of law that no reasonable jury could find it was willful in failing to investigate Plaintiffs' disputes....................................40

        2.   Equifax likewise fails to establish that no reasonable jury could find its complete reliance on Ally was willful..................................................................44

CONCLUSION ..................................................................................................44

## **TABLE OF AUTHORITIES**

**Cases**

*Alley v. First Am. Credco, Inc.*, No. 05 C 2130, 2007 WL 188036 (N.D. Ill. Jan. 19, 2007) ...... 27

*Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600 (7th Cir. 2006) ........................................ 32

*Bailey v. Experian Info. Sols., Inc.*, No. 1:21-cv-00465-BLW, 2023 WL 6317443 (D. Idaho Sept. 28, 2023) .......................................................................................................................................... 37

*Beers v. Experian Info. Sols., Inc.*, No. 20-cv-1797 (WMW/JFD), 2022 WL 891620 (D. Minn. Mar. 25, 2022) ...................................................................................................................................... 36

*Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330 (N.D. Ga. 2021) ........................... 36

*Benson v. Trans Union LLC*, 387 F. Supp. 2d 834 (N.D. Ill. 2005) ............................................... 30

*Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066 (D. Or. 2011).................. 32

*Bruan v. Client Servs., Inc.*, 14 F. Supp. 3d 391 (S.D.N.Y. 2014) ............................................... 23

*Buckley v. Afni, Inc.*, 133 F. Supp. 3d 1140 (S.D. Ind. 2016)....................................................... 13

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011)................................................................................................................................. 23

*Campbell v. Experian Information Solutions, Inc.*, No. CV 20-2498(DSD/BRT), 2022 WL 3716982 (D. Minn. Aug. 29, 2022) ................................................................................................. 36

*Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995).............................................. 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 14

*Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800 (7th Cir. 2023).............. 16, 17, 26

*Choudhury v. Citibank, N.A.*, No. 18-cv-02188 (RJD) (ST), 2018 WL 11447942 (E.D.N.Y. Dec. 7, 2018) .............................................................................................................................................. 33

*Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548 (1995) ...................................................... 27

*Cohen v. Equifax Info. Servs.*, 2019 WL 5200759 (S.D.N.Y. Sept. 13, 2019)............................... 28

*Coleman v. Experian Info. Sols., Inc.*, __ F. Supp. 3d __, No. 1:21-cv-1095-CAP, 2023 WL 2366609 (N.D. Ga. Feb. 6, 2023) .................................................................................................... 36

*Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015) .......... 20, 26, 34

*Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010)........................................................... 13

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001).............................................. 26, 34

*Crump v. Carrington Mortg. Servs., LLC*, No. 18 C 2302, 2019 WL 118490 (N.D. Ill. Jan. 7, 2019) ................................................................................................................................................. 34

*Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997) ..................................................... 13

*Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2008) .......................................................... 20, 34

*Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030 (D. Minn. 2010)...................................... 13

*Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998 (D. Minn. 2022)........................... 36, 37

*Fickel v. Clearwater Credit Union*, No. 21-cv-798-SMY, 2023 WL 2456116 (S.D. Ill. Mar. 10, 2023) ................................................................................................................................................. 34

*Grigoryan v. Experian Info. Sols. Inc.*, 84 F. Supp. 3d 1044 (C.D. Cal. 2014)........................... 12

*Gross v. CitiMortgage, Inc.*, 33 F.4th 1246 (9th Cir. 2022) ......................................................... 15

*Henry v. Freedom Mortg. Corp.*, 2020 WL 8921079 (D. Ariz. Apr. 27, 2020) .......................... 28

*Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994) .......................................................... 31

*Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK) (RER), 2022 WL 2841909 (E.D.N.Y. July 16, 2022)................................................................................................................................... 21

*Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989) ............................... 12

*Hurocy v. Direct Merchants Credit Card Bank, N.A.*, 371 F.Supp.2d 1058 (E.D. Mo. 2005)..... 23

*In re Helmes*, 336 B.R. 105 (Bankr. E.D. Va. 2005) ............................................... 15

*Jackson v. Experian Info. Sols., Inc.*, 236 F. Supp. 3d 1058 (N.D. Ill. 2017).......................... 14

*James M. v. Saul*, No. 20-cv-183, 2021 WL 2820532 (S.D. Ind. July 7, 2021) .......................... 44

*Kester v. Menard, Inc.*, No. 3:20-cv-50289, 2021 U.S. Dist. LEXIS 235824 (N.D. Ill. Dec. 9, 2021) ................................................................................................................ 14

*King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272 (N.D. Ga. 2006) .................................... 25

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405 (7th Cir. 2019)...................................... 44

*Laura v. Experian Info. Sols., Inc.*, No. 20-cv-01573, 2022 WL 823853 (N.D. Ill. Mar. 18, 2022) ................................................................................................................ 36

*Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937 (11th Cir. 2021) ........................ 19, 20, 26, 34

*Lynch v. Experian Info. Sols., Inc.*, No. 20-cv-2535 (KMM/JFD), 2022 WL 16857078 (D. Minn. Nov. 10, 2022) ..................................................................................................... 36

*Matter of Equifax, Inc.*, 96 F.T.C. 844, 1980 WL 338977 (F.T.C. Dec. 15, 1980) ..................... 22

*McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917 (W.D. Wis. 2004)................................ 24

*Milbauer v. TRW, Inc.*, 707 F. Supp. 92 (E.D.N.Y. 1989)........................................................ 27

*Myers v. Equifax Info. Servs., LLC*, No. 1:20-cv-00392-JMS-DLP, 2022 WL 4292179 (S.D. Ind. Sept. 16, 2022) ............................................................................................... 30, 31

*Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199 (D. Conn. 2013)...................................... 23

*Norman v. Trans Union, LLC*, 2023 WL 2903976, at *17 (E.D. Pa. Apr. 11, 2023).................. 28

*Ostrowski v. Lake County*, Nos. 21-1674, 21-2580, 2022 U.S. App. LEXIS 12673 (7th Cir. May 11, 2022) ................................................................................................................ 14

*Perry v. Experian Info. Solutions, Inc.*, No. 05-1578, 2005 WL 2861078 (N.D. Ill. Oct. 28, 2005) ................................................................................................................ 30

*Peterson v. Experian Information Solutions, Inc.*, No. CV 20-606 (DSD/ECW), 2021 WL 3116073 (D. Minn. July 22, 2021).................................................................................. 36

*Pfeffer v. Nat'l Credit Sys., Inc.*, 2017 WL 3600437 (S.D. Ohio Aug. 18, 2017) ...................... 28

*Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir.1996) .................................................... 23

*Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986)................................................................ 27

*Plotzker v. Equifax Info. Servs. LLC*, No. 19 C 4554, 2020 WL 1548956 (N.D. Ill. Apr. 1, 2020) ............................................................................................................. 15, 16

*Ricketson v. Experian Information Solutions, Inc.*, 266 F. Supp. 3d 1083 (W.D. Mich. 2017) .. 42, 43

*Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328 (N.D. Ga. 2022).................................... 28

*Roybal v. Equifax*, 2008 WL 4532447 (E.D. Cal. Oct. 9, 2008) ............................................. 28

*Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603 (7th Cir. 2005) ........................... 31

*Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007) ..................................................... 13, 14, 37, 42

*Salem v. Legal Liaison Serv.*, No. 16-cv-3927, 2019 WL 1057371 (N.D. Ill. Mar. 6, 2019). 14, 31

*Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 3894165 (N.D. Ill. Sept. 30, 2010).............. 34

*Sessa v. Trans Union, LLC*, 74 F.4th 38 (2d Cir. 2023) ....................................................... 17, 18

*Shannon v. Equifax Information Services, LLC*, 764 F. Supp. 2d 714 (E.D. Pa. 2011) .............. 30

*Stevenson v. TRW Inc.*, 987 F.2d 288 (5th Cir. 1993).......................................................... 33

*Terri N. White v. Experian Information Solutions, Inc.*, No. 05-cv-1070 (C.D. Cal.)........ 8, 34, 35

*Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938 (6th Cir. 2020) ............................................ 13

*United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023)...................... 37, 38, 39, 40

*Warner v. Experian Information Solutions, Inc.*, 931 F.3d 917 (9th Cir. 2019).......................... 28

*Wright v. Experian Info. Sols. Inc.*, 805 F.3d 1232, 1239 (10th Cir. 2015)............................... 13

**Statutes**

15 U.S.C. § 1681 ................................................................................................... 6

15 U.S.C. § 1681(b) .............................................................................................. 12

15 U.S.C. § 1681e(b) ......................................................................................... 12, 15

15 U.S.C. § 1681i ............................................................................................. 33, 41

15 U.S.C. § 1681i(a) .......................................................................................... 13, 15

15 U.S.C. § 1681i(a)(1)(A) ..................................................................................... 13

15 U.S.C. § 1681i(a)(5)(A) ..................................................................................... 21

15 U.S.C. § 1681i(a)(5)(A)(i) .................................................................................. 26

42 U.S.C. § 3729(a)(1)(A) ...................................................................................... 38

Pub. L. No. 104-208 § 2409 ................................................................................... 28

Pub. L. No. 91-508 § 611(a) ................................................................................... 28

Plaintiffs Craig and Brianna Dulworth ("Plaintiffs") oppose the Joint Motion for Summary Judgment filed by Defendants Equifax Information Services LLC and Experian Information Solutions, Inc. (ECF 180.) Because genuine issues of material fact exist as to each element on which Defendants move, the Court should decline to take this case away from the jury. The Court should therefore deny Defendants' Motion.

OVERVIEW

The summary judgment record shows that Plaintiffs disputed the erroneous reporting of a reaffirmed and never late automobile loan with two of the national consumer reporting agencies ("CRAs") in eight separate letters and were still unable to convince Equifax and Experian to correct their reporting. In response to Plaintiffs' disputes, Defendants doubled down on their mistakes by either completely ignoring the disputes, or by re-verifying the reaffirmed account as discharged in Plaintiffs' 2018 bankruptcy, despite information in both the public record and Defendants' own files contradicting their reporting. Despite their behavior in this case, the Defendants are sophisticated entities well aware of their obligations under the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA").

Genuine issues of fact preclude the entry of summary judgment on Plaintiffs' claims for negligent and willful violations of the FCRA. Issues relating to the reasonableness of the Defendants' procedures for reporting reaffirmed loans post-bankruptcy discharge, and the investigations or lack thereof, into the inaccurate reporting, in addition to whether the Defendants acted willfully, are jury questions in the overwhelming number of cases. This case is not the exceptional case that would warrant the Court removing these questions from the jury's consideration.

**FACTUAL BACKGROUND**

Plaintiffs are Indiana citizens who, on or about October 12, 2018, filed a joint bankruptcy under Chapter 7 of the bankruptcy code, case number 18-077856-JMC-7, in the Southern District of Indiana. ECF No. 194-1 (Ex. A - Plaintiffs' Bankruptcy Petition). Plaintiffs received a bankruptcy discharge on or about January 15, 2019. ECF No. 194-3 (Ex. B - Discharge Order). As part of the bankruptcy proceedings, Plaintiffs reaffirmed an automobile loan for a 2016 Kia Sedona with former Defendant Ally Financial/Ally Bank ("Ally") on or about December 20, 2018 in document twenty (20) of the bankruptcy. ECF No. 194-2 (Ex. B - Reaffirmation Agreement). In addition to being signed by the Plaintiffs, the reaffirmation agreement was signed by an Ally representative and was filed by Ally's counsel. Id. at 6. The reaffirmation agreement was timely filed under the Rules of Bankruptcy Procedure. Rule 4008(a).

At all relevant times Plaintiffs maintained current payments on the account. ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7 (noting that the account was current and "paid in full"). Because of Plaintiffs excellent payment history and the reaffirmation of the Ally loan, the account should have been reported as "reaffirmed" in the Plaintiffs' bankruptcy with a positive payment history instead of discharged. The inaccuracy is material because by reporting the account as "included in bankruptcy" the Defendants are taking an account which should have been positive, and turned it into a negative account. See ECF No. 195-5 (Ex. U - Hamilton Depo) ¶23:20–24:5.

Approximately a year after their bankruptcy, Plaintiff Brianna Dulworth reviewed her credit reports because she and Mr. Dulworth were interested in buying a house. ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 30:4–23). During this time, Ms. Dulworth discovered that Defendants Equifax and Experian reported the reaffirmed Ally loan as "included in bankruptcy." Id. ¶ 120:23–121:12). The reporting of the loan as "discharged" in bankruptcy is inaccurate as the loan should

have been reported as a current, timely-paid credit obligation and/or with a remark that the account was reaffirmed in bankruptcy.

Notwithstanding the maximum possible accuracy requirement Section 1681e(b),[1] Defendants reported the debt owed to Ally as discharged or included in bankruptcy after Plaintiffs reaffirmed the debt. *See e.g.*, ECF No. 194-10 (Ex. J - Craig Dulworth Sept. 2021 Dispute). Defendants' reporting the Ally loan as discharged or included in the Plaintiffs' bankruptcy is inaccurate. Plaintiffs set out to correct this misreporting first by contacting Ally, up to seven times, and requesting they correct the misreported loan information. ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 121:13–122:16). After it became clear that continuing to dispute directly to Ally was futile, the Plaintiffs went to the CRA Defendant by each submitting dispute letters to Equifax and Experian on September 7 and November 1, 2021 (totaling eight disputes, four to Experian and

---

[1] Defendants repeatedly reference the Agreed Bankruptcy Coding procedures for reporting post-discharge credit information that came into being through the 2008 settlement of the case *Terri N. White v. Experian Information Solutions, Inc*., No. 05-cv-1070 (C.D. Cal.) (the "*White* Settlement"). There the national CRAs agreed to a procedure for reporting post-discharge debts that predated the bankruptcy filing. The procedure for reporting pre-petition debt, after the entry of the bankruptcy discharge, as agreed to by the consumer reporting agencies, is generally outlined as follows:

    a) Defendants would first identity all accounts in a consumer's credit file which is in a collections status, and not reported as a closed account, and has an opening date that pre-dates or is equal to, the date of the bankruptcy filing.

    b) After identifying these accounts, Defendants would exclude certain accounts which must be reported pursuant to statute or policy (*e.g*., family or child support obligations, government fines, etc.).

    c) For the remaining collection accounts, Defendants would apply the Agreed Bankruptcy Coding procedure which includes reducing the balance to zero (or a blank balance) and including a status notation of "included in bankruptcy" on the account.

ECF No. 194-17 (Ex. V - *White* Settlement Order) at 18. This procedure was not applied in this case, for two reasons. First, Ally reported the account as included in bankruptcy and therefore this account was excluded from the post-bankruptcy scrub. Second, even if Ally had not reported the account as included in bankruptcy the CRAs still would not have applied the bankruptcy scrub procedures to the Ally account because it was in a positive (i.e., not delinquent) pay status at the time the bankruptcy was filed. Consequently, the procedures mandated to by the *White* settlement are completely inapposite for purposes of determining whether the reporting procedures here were reasonable.

Equifax each). *See generally*, <u>ECF Nos. 194-6</u>; <u>194-8</u>; <u>194-10</u>; <u>194-12</u> (Exs. F; H; J; L - Plt

Disputes to Equifax); <u>ECF Nos. 194-7</u>; <u>194-9</u>; <u>194-11</u>; <u>194-13</u> (Exs. G; I; K; M - Plt Disputes to

Experian).

     To assist them with the dispute process, Plaintiffs retained the Kansas City based law firm

of Stecklein & Rapp Chartered. Ms. Dulworth testified that she was the one who noticed the

inaccuracies during her own review of her credit reports <u>ECF No. 194-4 (Ex. D [Brianna Depo]</u>

<u>¶ 192:19–25</u>); that she provided information to her attorneys to help them draft the dispute letters

<u>*Id.* ¶ 110:3–7</u>); that she reviewed the dispute letters for accuracy (<u>*Id.* ¶ 110:8–13</u>); that she signed

the dispute letters <u>*Id.* ¶ 118:19–25</u>).

     Plaintiffs' disputes included personal identifying information for the Plaintiffs. *See e.g.*,

<u>ECF No. 194-6 Ex. F (Brianna Dulworth Sept. Dispute to EFX)</u>. The disputes were also signed by

the Plaintiff. <u>*Id.* at 8</u>. The disputes also included a detailed description of the inaccurate Ally

account (<u>*see id.* at 4–5</u>), a copy of each Plaintiff's driver's license (<u>*id.* at 9</u>), and a copy of the

reaffirmation agreement. <u>*Id.* at 10–15</u>.

     Of the four total disputes sent to Experian, none were investigated because Experian, by

its own admission, had categorized them as coming from an entity other than the consumers. <u>ECF</u>

<u>No. 183-3 (Hamilton Declaration) ¶ 21–22</u>. Experian did not contact the Plaintiffs at all as a result

of its decision to ignore their letters. <u>ECF No. 194-16 (Ex. R - EXP responses to Plt Second RFA)</u>

<u>¶ 26</u>. Experian's disposal of Plaintiffs' dispute letters was definitive in that Experian has no record

of ever receiving the disputes from the Plaintiffs. <u>ECF No. 195-5 (Ex. U - Hamilton Depo)</u>

<u>¶ 42:16–43:17</u> (Q. "Experian has no record of receiving communication from the plaintiffs, either

plaintiff regarding the Ally account?" A. "Correct, yes."). However, it cannot be disputed that an

Experian mail room technician, James Swanson, signed for Plaintiffs' certified disputes,

evidencing that they were, at a minimum, received by Experian. *See id.* ¶ 52:1–13; ECF No. 194-15 (Ex. Q - Experian resp to Plt first RFA) ¶ 3 ("Experian admits that James Swanson was an employee of Experian Information Solutions, Inc. between August 1, 2021 and December 1, 2021").

Of the four total disputes sent to Equifax, three were received. One for Plaintiff Craig Dulworth, and two for Plaintiff Brianna Dulworth. ECF No. 194-14 (Ex. P - EFX Responses to Plt 1st IROGs) at 2. As part of its general investigation procedures for the three disputes which were received, Equifax did not contact its public records vendor, nonparty LexisNexis, which supplies it with general bankruptcy information. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 25:6–20. Equifax also does not check PACER for the bankruptcy docket, which would have confirmed that the Dulworths' reaffirmation agreement was timely filed and valid. *Id.* ¶ 24:21–25:5. The only thing that Equifax does is send an ACDV to the furnisher, Ally Financial in this case, to confirm the accuracy of its own reporting.

The first Equifax investigation was Plaintiff Brianna Dulworth's September 2021 dispute. For this dispute, Equifax did not even do the one thing it says it supposed to do, which is send an ACDV to the furnisher to conduct its own investigation of the reporting. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 32:25–34:6. Equifax explains this error away as the agent responsible for reading the dispute potentially "misinterpret[ing]" the document. *Id.* ¶ 33:7–16; *see also* ECF No. 183-2 (Cobb Declaration) ¶ 57–59.

Plaintiff Craig Dulworth's September 2021 dispute was better interpreted. For this dispute, Equifax prepared an ACDV and sent it to Ally Financial, who verified that the account should be reporting as "included in bankruptcy." ECF No. 195-4 (Ex. T - Smith Depo) ¶ 43:6–13; see also ECF No. 195-1 (Ex. N - October 11 ACDV). This same ACDV also informed Equifax that the

account had a balance, was not past due, and had an account status of "11" meaning "current account" meaning that it was not in a delinquent status. _Id._ at 1. Without taking any other investigatory steps, Equifax informed Plaintiff Craig Dulworth that the inaccurate reporting would remain on his credit reports. ECF No. 195-4 (Ex. T - Smith Depo) ¶¶ 39:10–16; 52:1–7.

Equifax's investigation into Plaintiff Brianna Dulworth's November 2021 dispute proceeded exactly as had Plaintiff Craig Dulworth's September 2021 dispute. Equifax created and sent an ACDV to Ally Financial, who received the ACDV and responded that the account should continue to report as included in bankruptcy. ECF No. 195-2 (Ex. O - December 11, 2021 ACDV). Equifax informed Plaintiff Brianna Dulworth of that result. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 72:14–19. Equifax did not take any additional steps to investigate Plaintiff Brianna Dulworth's November dispute, even after receiving and completing its investigation of Plaintiff Craig Dulworth's September dispute. _Id._ ¶ 63:19–65:4.

The effect of being informed that their meritorious disputes as to the misreporting of the Ally loan were rejected caused the Dulworths significant distress. Ms. Dulworth testified that she suffers "high blood pressure and anxiety," "sadness and depression," and that she spoke with her medical doctor regarding the "overwhelming stress" in her life. ECF No. 194-4 (Ex. D - Brianna Depo) ¶ 240:22–242:15. These problems were compounded by the repeated failure to correct the inaccurate reporting of the reaffirmed Ally Loan in that Ms. Dulworth testified that she was frustrated with the dispute process with Experian and Equifax, and that the process was "exhausting." _Id._ ¶ 127:4–15. Mr. Craig Dulworth testified that his distress stems from "us trying to fix things, it never happened, so its very frustrating." ECF No. 194-5 (Ex. E - May 9 Craig Depo) ¶ 135:23–136:9. He testified to feeling helpless that "no one" would help with correcting the misreporting. _Id._

As a final attempt to correct the misreporting of the reaffirmed Ally loan, Plaintiffs filed suit in the Johnson Superior Court on February 1, 2022. ECF No. 1-1. This case was removed to this Court by Defendant Experian on March 10, 2022. ECF No. 1.

LEGAL FRAMEWORK

## I.     The FCRA Provisions At Issue.

Plaintiffs allege that Defendants acted with reckless disregard of their statutory duties by allowing the inaccurate reporting to appear on their consumer reports in violation of 15 U.S.C. § 1681e(b). Plaintiffs further allege that Defendants acted with reckless disregard of their statutory duties by failing to conduct reasonable investigations into Plaintiffs' disputes of the inaccurate reporting. Plaintiffs allege that Defendants' failure to correct the misreporting after notice and Plaintiffs' disputes violates Section 1681i of the FCRA.

The FCRA was enacted to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). Section 1681e(b) provides, "[w]henever a consumer reporting agency prepares a consumer credit report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

"The threshold question in a § 1681e(b) action is whether the challenged information is inaccurate." *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989). An allegation of an actual inaccuracy is one that challenges the factual accuracy of the information provided by a furnisher to a CRA. *See Grigoryan v. Experian Info. Sols. Inc.*, 84 F. Supp. 3d 1044 (C.D. Cal. 2014). "[T]he distinction between 'accuracy' and 'maximum possible accuracy' is . . .

12

quite dramatic." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010). The use of the phrase "maximum possible accuracy" thus "suggests that Congress wanted to hold CRAs to a higher standard than mere technical accuracy." *Twumasi-Ankrah v. Checkr, Inc*., 954 F.3d 938, 942 (6th Cir. 2020).

15 U.S.C. § 1681i(a) requires that, when a consumer notifies a CRA of a dispute regarding "the completeness or accuracy of any item of information contained in the consumer's file," the CRA must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." *Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030, 1039 (D. Minn. 2010); 15 U.S.C. § 1681i(a)(1)(A). A claim for violations of § 1681i requires that; (1) the consumer disputes to the consumer reporting agency of an; (2) inaccuracy in their; (3) consumer report, and the consumer reporting agency; (4) failed to follow reasonable procedures for reinvestigating the consumer's dispute about their report. *Wright v. Experian Info. Sols. Inc*., 805 F.3d 1232, 1239 (10th Cir. 2015); *Cushman v. Trans Union Corp*., 115 F.3d 220, 225 (3d Cir. 1997). "Courts have consistently held a reasonable investigation requires more than 'making only a cursory investigation into the reliability of information that is reported to potential creditors.'" *Wright*, 805 F.3d at 1242 (citing *Cortez*, 617 F.3d at 712–13)).

Here, Plaintiffs bring claims for both negligent and willful violations of the FCRA. "To willfully violate the FCRA, a company must do so recklessly." *Buckley v. Afni, Inc*., 133 F. Supp. 3d 1140, 1147 (S.D. Ind. 2016) (citing *Safeco Insurance Co. v. Burr*, 551 U.S. 47, 69 (2007)). "A company does not act in reckless disregard of the FCRA, however, unless the action it takes is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was

merely careless." *Jackson v. Experian Info. Sols., Inc*., 236 F. Supp. 3d 1058, 1065 (N.D. Ill. 2017)

(quoting *Safeco*, 551 U.S. 47, 69 (2007)).

## II.    Summary Judgment Standards.

"Summary judgment is warranted when there are no genuine disputes of material fact

between the parties and no reasonable factfinder could find for the non-movant on an essential

element on which it bears the burden of proof at trial." *Ostrowski v. Lake County*, Nos. 21-1674,

21-2580, 2022 U.S. App. LEXIS 12673, at *8 (7th Cir. May 11, 2022) (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986)). The burden to make such a showing is on the movant. *Kester

v. Menard, Inc*., No. 3:20-cv-50289, 2021 U.S. Dist. LEXIS 235824, at *3-4 (N.D. Ill. Dec. 9,

2021). "Material facts are those that might affect the outcome of the suit." *Id*. (quoting *Anderson

v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986)). "The Court must construe the 'evidence and all

reasonable inferences in favor of the party against whom the motion under consideration is

made.'"). *Id*. (quoting *Rickher v. Home Depot, Inc*., 535 F.3d 661, 664 (7th Cir. 2008)). "'Summary

judgment is only warranted if, after doing so, [the court] determine[s] that no jury could reasonably

find in the nonmoving party's favor.'" *Id*. (quoting *Blasius v. Angel Auto, Inc*., 839 F.3d 639, 644

(7th Cir. 2016)). Defendants fail to meet their burden.

ARGUMENT AND AUTHORITIES

## I.    Genuine Issues Of Material Fact Exist As To The Accuracy Of Defendants' Reporting Of The Account.

### A.    The Phantom Distinction Between Legal And Factual Questions Does Not Absolve Defendants Of Their FCRA Duties.

Claims under Section 1681e(b) and 1681i both have accuracy components. *Salem v. Legal

Liaison Serv.*, No. 16-cv-3927, 2019 WL 1057371, at *3 (N.D. Ill. Mar. 6, 2019). A report can be

inaccurate if it is patently false, or misleading such that it can be expected to adversely impact

14

credit decisions. *Plotzker v. Equifax Info. Servs. LLC*, No. 19 C 4554, 2020 WL 1548956, at *3 (N.D. Ill. Apr. 1, 2020). Defendants' centerpiece argument on accuracy is that whether the affirmation agreement between Plaintiffs and Ally is valid and should result in reporting the Account differently than Ally indicated is a legal dispute into which CRAs cannot wade. (ECF 186 at 16–18.) Defendants cling to this argument, pretending they are not able to arrive at such supposed legal conclusions, despite the fact that they did just that—again and again—by reporting the Account as included or discharged in bankruptcy. That reporting is the epitome of a legal conclusion, *In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005), which Defendants make every day in their regular reporting processes. Defendants accept and repeat such conclusions from furnishers like Ally as though it were gospel truth and despite the fact that bankruptcy filings and Defendants' own records show otherwise. So Defendants make and report legal conclusions constantly when it suits them, but when they are sued they and want to avoid liability retreat to the legal/factual distinction that has some traction in courts, but no basis whatsoever in the statute. *See* 15 U.S.C. §§ 1681e(b), 1681i; *see also Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022) ("The distinction between 'legal' and 'factual' issues is ambiguous, potentially unworkable, and could invite furnishers to 'evade their investigation obligation by construing the relevant dispute as a 'legal' one.'").

There is however, an additional problem for Defendants that does not depend on the legal versus factual distinction. Defendants could have included within Plaintiffs' credit reports a notation that they were making payments pursuant to an agreement even if Defendants had doubts about its validity. Defendants possessed the Agreement, as Plaintiffs submitted it with their disputes. *See generally*, ECF Nos. 194-6; 194-8; 194-10; 194-12 (Exs. F; H; J; L Plt Disputes to Equifax); ECF Nos. 194-7; 194-9; 194-11; 194-13 (Exs. G; I; K; M Plt Disputes to EXP).  As

Experian is aware, the Seventh Circuit recently considered this precise issue in *Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800 (7th Cir. 2023). In that case, the plaintiff fell into financial difficulties, and signed an agreement with his mortgage company to stave-off foreclosure called a Trial Period Plan, or TPP. *Id.* at 808. Chaitoff's credit reports, however, did not reflect the payments made pursuant to the agreement—they stated his account was delinquent. *Id.* Chaitoff disputed the reporting with Experian, and when it did not correct the reporting, he sued, like Plaintiffs, under Sections 1681e(b) and 1681i of the FCRA. *Id.* at 810–11.

Experian moved for summary judgment and argued, as here, its reporting was accurate because "the existence and effect of Chaitoff's TPP were both legal questions beyond its competency to resolve" but, even if the reporting was inaccurate, its reporting and investigation procedures were reasonable as a matter of law. *Id.* The district court granted the motion, agreeing that Chaitoff's complaint was the legal accuracy of his loan modification, not the factual accuracy of it. *Id.* at 811. The court alternatively agreed that the reporting and dispute procedures were reasonable regardless of the accuracy of the reporting. *Id.*

The Seventh Circuit reversed that decision. It concluded that Experian's failure to mention the TPP in Chaitoff's credit reports was a material omission, rendering the reporting short of the "maximum possible accuracy" standard imposed by Section 1681e(b) of the FCRA. *Id.* at 813–14. As the court put it: "The debtor without the TPP has no evidence that she can make timely and complete payments, but the debtor who completed the TPP does." *Id.* It added a remark from the Sixth Circuit, which noted "[r]eporting that a consumer 'was delinquent on his loan payments without reporting the TPP implies a much greater degree of financial irresponsibility.'" *Id.* (quoting *Pittman v. Experian Info. Sols.*, 901 F.3d 619, 639 (6th Cir. 2018)); *see Plotzker*, 2020 WL 1548956, at *3 (noting that a report can be inaccurate if it is misleading in a way that would

adversely impact credit decisions). The court further explained, in discussing Experian's (and also Defendants' here) foundational argument that such reporting involved a legal dispute it could not resolve:

> Whether Chaitoff's TPP existed is a factual question because Experian was not asked to apply law to facts. Nothing in Chaitoff's complaint can be read to collaterally attack his Ocwen mortgage. Rather, Chaitoff asked that his credit report reflect his TPP, something well within Experian's capabilities. It is, after all, a credit reporting agency. Nothing about Chaitoff's alleged inaccuracy required Experian to investigate beyond the face of the documents it was provided. *Henson* [*v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994)] held that CRAs act reasonably when they rely on legal documents of unquestioned authenticity. *Chuluunbat* [v. *Experian Information Solutions*, 4 F.4th 562 (7th Cir. 2021)] recognized the flip side of the rule: a CRA might be liable if it ignores or overlooks documents of unquestioned authenticity, even if they relate to a legal dispute. Such is the case here. The existence of Chaitoff's TPP was a factual—not legal—dispute, and the district court was wrong to conclude otherwise.

*Id.* at 815.

Little is different here. First, it cannot be definitively said that Plaintiffs present a purely legal issue in their inaccuracy disputes. Courts regularly recognize that the quintessential "legal dispute is when a consumer argues that although his debt exists and is reported in the right amount, it is invalid due to a violation of law.'" *Id.* (quoting *Chuluunbat*, 4 F.4th at 567). Or, more simply, "legal disputes amount to collateral attacks on the disputed debt." *Id.* Nothing like that is happening here. In fact, this case presents the opposite scenario—Plaintiffs claim that they *do* owe the debt, yet Defendants are reporting that fact inaccurately. Plaintiffs are not collaterally attacking anything.

Other decisions have poked further holes into the legal-versus-factual-question debate. In *Sessa v. Trans Union, LLC*, 74 F.4th 38 (2d Cir. 2023), a dispute about whether a CRA accurately reported as a debt a balloon-payment option at the end of a vehicle lease where no such payment was truly due, saw the Second Circuit again reverse a summary judgment for the CRA. *Id.* at 40.

The court held "there is no bright-line rule providing, as the District Court concluded, that only purely factual or transcription errors are actionable under the FCRA." *Id.* at 43. Instead, the court reasoned:

> The question of whether a debt is objectively and readily verifiable will <u>sometimes</u>, as it did in <u>Mader</u>, involve an inquiry into whether the debt is the subject of a legal dispute. There, the issue of whether Mader's debt had been discharged presented an "unresolved legal question" under bankruptcy law, which "render[ed] his claim non-cognizable under the FCRA." <u>Id.</u> at 270. But that does not mean that any dispute that might arguably turn on a question of law is non-cognizable under the FCRA. As the <u>Mader</u> Court explained, CRAs may be "required by the FCRA to accurately report information derived from the readily verifiable and straightforward application of law to facts."

*Id.* (emphasis in original). Thus, the question in *Sessa*, like here, has nothing to do with the legal import of the balloon payment or lease terms, just whether the balloon payment existed. Since it did not, the CRA could have easily figured that out without needing to resort to any application of law to facts.

So too here. Defendants did not have to concern themselves with the validity of the reaffirmation agreement, only whether it existed. It did. When Defendants learned that, the FCRA obligated them to do something about what they were reporting so that it was maximally accurate. Noting on Plaintiffs' credit files that the reaffirmation agreement existed and Plaintiffs were making payments pursuant to it required almost no effort by Defendants, and would have given them cover in the case of a lawsuit like this one. Rather than make any meaningful change, Defendants acted as if Ally's interpretation of what happened to the debt in bankruptcy deserved more weight than Plaintiffs'. And they did that despite having other, verifiable and objective evidence that Plaintiffs were making payments as if the agreement existed. <u>ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7</u> (noting that the account was current and "paid in full"); <u>ECF No. 195-1 (Ex. N – October 2021 ACDV)</u> (noting that the account status was "current" with no past due

amounts). Defendants' conclusion is based at best on conflicting information, and *Chaitoff* confirms it is inappropriate for Defendants to have reacted as they did.

Another case in which Experian was a party and raised this same defense, *Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937 (11th Cir. 2021), further supports a denial of Defendants' Motion. *Losch* involved the opposite of what is present here—the consumer claimed that he entered into a reaffirmation agreement relating to a debt in bankruptcy, but then withdrew that agreement. *Id.* at 941. Experian continued to report the debt as past due, and Losch disputed and explained that he had "rescinded the reaffirmation in 2018 and the court approved that so [he] no longer own this debt." *Id.* Experian would not correct the inaccuracy, relying just on the furnisher's responses to the ACDVs Experian sent. *Id.* Losch then sued Experian and the furnisher, asserting the same FCRA claims—Sections 1681e(b) and 1681i—against Experian as Plaintiffs do here. *Id.* The district court granted summary judgment to Experian, holding that all Experian had to do was notify the furnisher of the consumers' disputes, which Experian did; Losch did not provide Experian with enough information for it to decide the disputes his way; and Losch's theory of liability would require CRAs to review and determine the legal effect of court orders and documents. *Id.* at 941–42.

The Eleventh Circuit reversed, finding that Experian's reliance on just the answer of its furnisher, without "conduct[ing] *any* independent investigation" was not reasonable as a matter of law. *Id.* at 946–47 (emphasis in original). All Experian would have to do was consult the bankruptcy docket to confirm whether Losch indeed withdrew the reaffirmation agreement, yet it did not do that despite Losch's detailed disputes showing what Experian would need to investigate. *Id.* Experian argued in *Losch* that his bankruptcy was "confusing and unusual," and it could not reach the right conclusion after consulting the docket. *Id.* at 946. Here, it takes the opposite

approach, arguing it does not have to do anything regarding the docket, as what Ally provides is enough to insulate it from liability. Wrong, again.

The *Losch* court also discussed *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015), and *Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2008), two cases that supported its decision. *Collins* likewise involved a case in which Experian relied solely on the furnisher for its investigation, circumstances the district and circuit found to create an issue of fact as to the reasonableness of Experian's decision to disregard the information the plaintiff provided in favor of the verification of its furnisher. *Losch*, 995. F.3d at 946.

The court characterized *Dennis* as "similar," as it involved Experian reporting on the plaintiff's credit that a judgment had been entered against him where, in fact, the case had been dismissed. *Id.* Experian again did nothing to investigate, relying instead on a third-party vendor for that. The vendor did not correct the information, but instead confirmed it. *Id.* The Ninth Circuit found reasonableness to be a jury question, as a simple check of the bankruptcy docket would have confirmed Experian's and the vendor's mistake. *Id.* Aligning *Losch* with *Dennis*, the court noted that Experian could not have known what it would have found in the bankruptcy docket without looking there based on what Losch provided. Yet it did not, dooming its request for summary judgment as to reasonableness. *Id.*

This case presents the same scenario—Defendants want the Court to conclude that relying on the furnisher was reasonable as a matter of law when Defendants knew they had conflicting information about the Ally account and might have resolved the confusion by checking the bankruptcy docket. Defendants did not do that, or anything else, relying solely on Ally instead. The Court should conclude that these are not the facts to grant summary judgment to Defendants.

Second, and more to the point, Plaintiffs' disputes did not require Defendants to decide if the reaffirmation agreement was valid. After all, the FCRA does not necessarily require Defendants to take that step in investigating a dispute and the information from the consumer and the furnisher conflicts. Instead, Section 1681i demands Defendants take other steps when they cannot verify information:

> (i) promptly *delete that item of information* from the file of the consumer, or *modify that item of information*, as appropriate, based on the results of the reinvestigation; and

> (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

15 U.S.C. § 1681i(a)(5)(A) (emphasis added). In other words, if Defendants cannot figure out whether the reaffirmation agreement is valid, they cannot simply soldier on—they have to modify the reporting or delete it. Here, Defendants did neither, despite acknowledging their inability to determine who was right—Plaintiffs or Ally. The FCRA, however, does not contain a provision that applies to "ties"—the CRA must continue to meet the maximum-possible-accuracy demand. Modification of the Ally account in Plaintiff's credit file would at least have brought the reporting in line with *Chaitoff*, a case Experian knows about because the same Counsel represents it here as did there, yet Experian seems to have not taken anything from that holding. But modification is not all Defendants could have, or should have, done. They could have rightly deleted the account as an alternative. 15 U.S.C. § 1681(a)(5)(A); *Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK) (RER), 2022 WL 2841909, at *21 (E.D.N.Y. July 16, 2022) ("If disputed information is found to be inaccurate or incomplete, or if it cannot be verified pursuant to a reinvestigation, it must be deleted from the consumer's credit report."). Doing nothing does not meet the FCRA's accuracy requirement or reasonable-investigation demand. Defendants are therefore not entitled to summary judgment on the accuracy element of either claim.

**B.      Defendants Also Cannot Rely On The "Bankruptcy Is Hard" Defense As A Reason To Habitually Violate The FCRA.**

There is no requirement in the FCRA that anyone—creditors, the credit bureaus, or courts—engage in credit reporting. Defendants earn billions every year trading information about consumers that the consumers have no hand in providing or controlling. Yet, they pepper their brief with complaints of "the legal and factual complexity inherent in consumer bankruptcies," "the FCRA and legal precedent does not require the CRAs to determine the validity of a complex legal documents such as reaffirmation agreement in a bankruptcy proceeding," and "determining whether there is an enforceable contract between a furnisher and a consumer turns on complex questions of bankruptcy law that far 'exceed[ ] the competencies of consumer reporting agencies.'" (ECF 186 at 5, 10 n.5, 18.) Perhaps if this area of law is so complex and difficult, Defendants should stop including it in the reports they make so much money selling.

The rigor required of a CRA by § 1681e(b) is well-recognized. As the Federal Trade Commission ("FTC") long ago explained, the "provision require[s] reporting agencies to do whatever is reasonable under the circumstances to minimize the chances that consumers will be harmed by inaccurate reporting." *Matter of Equifax, Inc*., 96 F.T.C. 844, 1980 WL 338977, at *142 (F.T.C. Dec. 15, 1980). "If an agency employs a procedure which does not offer the best assurance of producing the most accurate reports, it ought to have a strong justification for doing so." *Id.* More recently, yet still long enough ago for Experian to have changed its procedures, another court reiterated those duties, explaining,

> In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth, as they apply to this case, in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A). Section 1681e(b) sets forth the CRAs' overall duly:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc*., No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011). The most-significant import of these instructions is that Defendants are statutorily obligated to get things right. If they cannot, they should stop reporting this difficult category of information so they can otherwise meet the maximum possible accuracy standard the FCRA imposes.

## II.   Genuine Issues of Material Fact Preclude Entry of Summary Judgment on the Issues of Whether the Plaintiffs Suffered Actual Damages.

"In order to survive a summary judgment motion on a claim of negligent violation of the FCRA, a plaintiff must provide some evidence from which a reasonable fact-finder could conclude that she suffered actual damages as a result of the defendant's actions." *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 208 (D. Conn. 2013); *see also Hurocy v. Direct Merchants Credit Card Bank, N.A.*, 371 F.Supp.2d 1058, 1061 (E.D. Mo. 2005) ("Actual damages under the FCRA may include damages for humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses, as well as damages for injury to reputation and creditworthiness."). That the Dulworths have suffered "actual damages" is an essential element of their claim for negligent violations of FCRA. *Bruan v. Client Servs., Inc*., 14 F. Supp. 3d 391, 397–98 (S.D.N.Y. 2014) (collecting cases holding that actual damages are a necessary element to a claim for negligent violation of the FCRA).

A long, unbroken line of courts recognize that emotional distress and mental anguish are actual damages and the Dulworths are not required to have sought medical assistance to prove these types of damages. *See Philbin v. Trans Union Corp*., 101 F.3d 957, 963 n.3 (3d Cir.1996)

("Given the amorphous nature of the damages at issue, we do not consider it necessary that [the plaintiff] state his damages with any greater degree of particularity."); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) ("[T]he District Court properly recognized that 'actual damages' may include humiliation and mental distress, even in the absence of out-of-pocket expenses.").

Plaintiff Brianna Dulworth has testified extensively as to the emotional distress she suffered and that she observed her husband suffering as a result of the credit reporting inaccuracies, and the Defendants' failure to correct the inaccuracy after dispute. Specifically, Mrs. Dulworth testified that she suffers "high blood pressure and anxiety," "sadness and depression," and that she spoke with her medical doctor regarding the "overwhelming stress" in her life. ECF No. 194-4 (Ex. D - Brianna Depo) ¶ 240:22–242:15. Mrs. Dulworth testified that she was frustrated with the dispute process with Experian and Equifax, and that the process was "exhausting." *Id*. ¶ 127:4–15.

For his part, Mr. Dulworth testified that his distress stems from "us trying to fix things, it never happened, so it's very frustrating." ECF No. 194-5 (Ex. E - May 9 Craig Depo) ¶ 135:23–136:9. He testified to feeling helpless that "no one" would help with correcting the misreporting. *Id.* That the misreporting of Plaintiffs' reaffirmation with Ally continued dispute multiple disputes and opportunities for the Defendants to correct the error, is a classic case of emotional distress. "A consumer may suffer distress if he has difficulty in correcting his credit history or trouble managing his finances until his history is corrected; this is true regardless whether his erroneous information was actually published to a third party." *McKeown v. Sears Roebuck & Co*., 335 F. Supp. 2d 917, 933 (W.D. Wis. 2004) ("Other courts have routinely assumed or suggested that emotional distress damages are available when a party experiences a significant frustration and anxiety brought on by failed attempts to have the errors corrected.").

Thus, the Dulworths have presented sufficient evidence of actual damages to present their claims for negligent violations of the FCRA to the jury. *See King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1281 (N.D. Ga. 2006) ("Plaintiff claims to have suffered emotional distress damages, including embarrassment, frustration, and irritability as a result of Defendant's violations of the FCRA. Plaintiff has provided his testimony in support of his allegations. Based on this evidence, the Court cannot say, as a matter of law, that Plaintiff is not entitled to recover damages for emotional distress"). Summary judgment on this issue is therefore improper.

**III.   Genuine Issues Of Material Fact Exist As To The Reasonableness Of Defendants' Investigations Of Plaintiffs' Disputes.**

Defendants' factual recitation and arguments claim they were unable to, and should not be required to, decide whether the Account was included in or discharged by Plaintiffs' bankruptcy or reaffirmed through the agreement with Ally. (ECF 186 at 17–18.) As Defendants put it:

> Plaintiffs' claims present legal issues related to the validity of their reaffirmation agreement with Ally that are not suitable for resolution by Defendants. The only two parties to the reaffirmation agreement at issue in this case are Plaintiffs and Ally, *and the record evidence shows that they disagreed as to whether the debt was discharged*. Plaintiffs claim that the debt was not discharged, but Ally verified the debt as reporting accurately, including after this litigation was filed.

(*Id.* at 18 (emphasis added, citations omitted).) Rather than take Plaintiffs' word as to the validity of the reporting of the Account, which was supported by their detailed disputes (*see e.g.*, ECF Nos. 194-6; 194-8; 194-10; 194-12 (Exs. F; H; J; L Plt Disputes to Equifax)) and Defendants' records that Plaintiffs continued to pay on the account even after the supposed discharge (ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7 (noting that the account was current and "paid in full"), Defendants took Ally's side. But since there is no "tie goes to the furnisher" provision in the FCRA, unless Defendants' own Section 1681i investigations—not Ally's supposed investigation that it must independently undertake under Section 1681s-2(b)—verified that the account was

included in or discharged in Plaintiffs' bankruptcy, Defendants were required by the FCRA to "promptly delete" it. 15 U.S.C. § 1681i(a)(5)(A)(i). Yet, despite their supposed utter inability to determine which party was correct, Defendants went with their paying customer, Ally. The reasonableness of that conduct must go to the jury. *Losch*, 995 F.3d at 937 (finding genuine issues of material fact as to Experian's reliance on furnisher in dispute over reporting of account extinguished in bankruptcy, noting Experian "did nothing, although it easily could have done *something* with the information that [plaintiff] provided") (emphasis in original); *Collins*, 775 F.3d at 1333 (11th Cir. 2015) (denying summary judgment because "an issue of material fact remained as to whether Experian's investigation was reasonable when it disregarded the . . . information [plaintiff] provided and instead relied solely on [the furnisher] to verify the debt"); *see Chaitoff*, 79 F.4th at 818 (discussing *Collins* and *Losch*, and citing their holdings favorably).

While the term "verify" is defined as "to establish the truth, accuracy, or reality of," and "to confirm or substantiate in law by oath,"[2] Defendants did nothing close to this. Instead, as they readily admit, Equifax just transmitted Plaintiffs' disputes to Ally and waited to see what Ally said in return (ECF 186 at 9–11), and Experian did nothing at all (*id.* at 11–13). Both scenarios confirm that fact issues exist as to the reasonableness of this conduct. This is particularly true in light of the Seventh Circuit's long-held belief that reasonableness is a question for the jury in the majority of cases. *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) ("The determination of the 'reasonableness' of the defendant's procedures, like other questions concerning the application of a legal standard to given facts (notably negligence, a failure to exercise reasonable care), is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonableness or unreasonableness of the

---

[2] https://www.merriam-webster.com/dictionary/verify.

procedures is beyond question . . . ."); *Alley v. First Am. Credco, Inc.*, No. 05 C 2130, 2007 WL 188036, at *5 (N.D. Ill. Jan. 19, 2007) (declining to award summary judgment because of fact questions as to reasonableness).

A. **Experian Conducted No Investigations At All Because It Improperly Decided—With No Real Evidence—That Plaintiffs' Disputes Did Not Come From Them.**

Experian takes the cavalier position that it did not need to do anything with Plaintiffs' disputes because they came from Plaintiffs' Counsel, which Experian claims—with no genuine basis in fact—is a "credit repair organization." (ECF 186 at 27.) That being supposedly true, the argument goes, the disputes did not come "directly" from Plaintiffs, so Experian's Section 1681i investigation obligation was never triggered. (*Id.* at 27–29.) Experian therefore did not investigate those disputes as required by Section 1681i. While Experian's arguments focus on what Experian thinks it knows about the similarity among letters and the processor used to actually mail them, there is much more to the analysis of whether a dispute came "directly" from a consumer than the one in which Experian engages.

For the first quarter century after Congress enacted the FCRA, courts regularly, and logically, recognized that consumers' credit-reporting disputes are often crafted with the help of counsel. *See Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) ("Once [the credit reporting agency] received notice of the dispute . . . from [the plaintiff's] attorney[,] it was obligated to re-verify the accuracy of the delinquent entry."); *Milbauer v. TRW, Inc*., 707 F. Supp. 92, 94–95 (E.D.N.Y. 1989) (credit-reporting agencies "are not privileged to ignore a consumer's dispute simply because" it was submitted by a consumer's attorney); *Cisneros v. U.D. Registry, Inc*., 39 Cal. App. 4th 548, 573 n.12 (1995) ("[A] representative working on behalf of the consumer can convey the consumer's position on disputed information and the requirements of response and

reinvestigation [under the FCRA] apply."). While Congress changed the language of this portion of the FCRA, from the FCRA's original requirement that a credit-reporting agency conduct a reinvestigation of disputed information if "such dispute is directly conveyed to the consumer reporting agency by the consumer," Pub. L. No. 91-508 § 611(a), to amended language providing that a reinvestigation must take place if "the consumer notifies the agency directly of such dispute," Pub. L. No. 104-208 § 2409. This alteration is at most stylistic, as it cannot be read to meaningfully change a CRA's obligation to investigate a dispute based on its origin.

Even since the changes to the FCRA, courts have approached the "directly" modifier as they did before—assistance from a lawyer, family member, or even a credit-repair organization does not eliminate a CRA's reinvestigation obligations. *Norman v. Trans Union, LLC*, 2023 WL 2903976, at \*17 (E.D. Pa. Apr. 11, 2023); *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 347 (N.D. Ga. 2022); *Henry v. Freedom Mortg. Corp*., 2020 WL 8921079, at \*4 (D. Ariz. Apr. 27, 2020); *Cohen v. Equifax Info. Servs*., 2019 WL 5200759, at \*6 (S.D.N.Y. Sept. 13, 2019); *Pfeffer v. Nat'l Credit Sys., Inc*., 2017 WL 3600437, at \*6 n.1 (S.D. Ohio Aug. 18, 2017); *Roybal v. Equifax*, 2008 WL 4532447, at \*6 n.6 (E.D. Cal. Oct. 9, 2008); *cf. Warner*, 931 F.3d at 921. Experian hopes for a different result here, but has little to support it.

The fundamental problem with Experian's approach is that it makes a decision—that a dispute did not directly come from a consumer—without knowing anything specific about the consumer's role in the submission of the dispute. And that is everything, as even Experian's cited case, *Warner v. Experian Information Solutions, Inc*., 931 F.3d 917, 921 (9th Cir. 2019), confirms by its statement that the Section 1681i dispute obligation is not triggered only where the consumer plays *almost no role* in the dispute process. (ECF 186 at 28.) Here, by contrast, Plaintiffs were meaningfully involved in the creation of their disputes and directed their Counsel to submit them

to the CRAs. <u>ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 115:16–116:10)</u> ("I gave them information. They communicated often. We did paperwork together. I signed. They sent.").

What is more, Experian did not learn anything that could rationally support its decision about Plaintiffs' disputes until it took Plaintiffs' depositions after they sued. It can therefore say little about the propriety of the conclusion that the disputes came from a credit repair organization, as not only was it wrong at the time Experian made it, and it remains wrong even after Experian had the chance to ask Plaintiffs about it.

In sum, genuine issues of material fact exist as to whether Experian reasonably investigated Plaintiffs' disputes. The Court should therefore deny summary judgment on this claim.

**B.    Equifax Has Not Shown Its Investigations Were Reasonable As A Matter Of Law Because All Equifax Did Was Transmit The Disputes To Ally And Wait For Ally's Response.**

**1.    Regardless of what Ally was telling Defendants, they have their own FCRA obligations to investigate and verify information.**

Nothing in the FCRA permits CRAs to shirk their investigation responsibilities in favor of simply regurgitating what a furnisher tells the CRA about an account. Here, rather than take Plaintiffs' word as to the validity of the reporting of the Account, which was supported by their detailed disputes and Defendants' records that Plaintiffs continued to pay on the account even after the supposed discharge (<u>ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7</u>), Defendants took Ally's. That approach was improper as explained above and highlighted by *Losch*, *Dennis*, and *Collins*, but there is yet more to address.

While the term "verify" has legal heft and is meaningful in the FCRA context, Equifax readily admits that it just transmitted Plaintiffs' disputes to Ally and waited to see what Ally said in return (ECF 186 at 9–11), and Experian did nothing as discussed just above (*id.* at 11–13). Both scenarios confirm that fact issues exist as to the reasonableness of this conduct.

Equifax argues that its dispute investigations—just sending ACDVs to Ally and doing nothing other than waiting for a response—were reasonable because "the ACDV approach has been upheld as a matter of law by other courts." (ECF 186 at 25 (collecting cases).) That is wrong, as Equifax's cited cases confirm. *Shannon v. Equifax Information Services, LLC*, 764 F. Supp. 2d 714, 725–26 (E.D. Pa. 2011), did not hold the ACDV process was reasonable as a matter of law. It held the opposite—"[the court] will similarly submit Equifax's § 1681i(a) claim to a jury." *Id.* at 724. *Benson v. Trans Union LLC*, 387 F. Supp. 2d 834, 843 (N.D. Ill. 2005) is no more helpful, as it merely held that Trans Union's use of the ACDV process was sufficient because Benson did not show what other information a more-robust investigation would have turned up. *Id.* at 843. *Perry v. Experian Info. Solutions, Inc.*, No. 05-1578, 2005 WL 2861078, at *5 (N.D. Ill. Oct. 28, 2005), is similar, as there the court found the use of ACDVs as lone form of investigation by Experian was reasonable "based on the scant information [the consumer] provided" with his disputes.[3]

Equifax also does not address a key difference between this case and the others it cites— here, Equifax was on notice that Ally could not be trusted as a furnisher when it comes to reaffirmation agreements. That lack-of-reliability notice came from two sources: Plaintiffs, through their multiple, detailed disputes, and the litigation of *Myers v. Equifax Info. Servs., LLC*, No. 1:20-cv-00392-JMS-DLP, 2022 WL 4292179, at *1 (S.D. Ind. Sept. 16, 2022), a case on which Defendants rely heavily. Despite being let off the hook in *Myers*, these Defendants were

---

[3] The remaining cases are not as much assistance as Equifax hopes. *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 756 (S.D. Tex. 2006), *aff'd*, 224 Fed. Appx. 415 (5th Cir. 2007), was a case with a single dispute, not multiple disputes like this case, *Anderson v. Trans Union LLC*, 367 F. Supp. 2d 1225, 1233 (W.D. Wis. 2005), involved a disputed inaccuracy that was corrected after one dispute, and *Schmitt v. Chase Manhattan Bank, N.A.*, No 03-3295, 2005 WL 2030483, at *3 (D. Minn. Aug. 23, 2005), was a case wherein the furnisher and CRA made multiple mistakes in failing to correct inaccurate notation the consumer was deceased.

certainly aware that Ally did not know what it was doing when consumers entered into reaffirmation agreements with it. Plaintiffs' disputes here confirm that.

The facts here also distance this case from *Myers*, as that case did not involve any disputes of the Ally reporting. *Myers*, 2022 WL 4292179, at \*6–8 ("Mr. Myers never disputed his Ally account with Equifax. . . . Mr. Myers never submitted a dispute to Experian regarding the reporting of the Ally account and never provided Experian with a copy of the Ally reaffirmation agreement. . . . Mr. Myers never contacted Trans Union regarding the reporting of the Ally account."). Plaintiffs' multiple disputes place this case much further from *Myers* than Defendants would have the Court conclude.

The Seventh Circuit has long recognized that notice of inaccuracies changes how CRAs and furnishers must approach disputes:

> A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice. As we indicated earlier, a credit reporting agency may initially rely on public court documents, because to require otherwise would be burdensome and inefficient. However, such exclusive reliance may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report.

*Henson v. CSC Credit Servs*., 29 F.3d 280, 286 (7th Cir. 1994). While Defendants will certainly point out that *Henson* was decided at the Rule 12(b)(6) stage and not summary judgment, courts within this Circuit have nonetheless applied it in the summary judgment context. *Salem v. Legal Liaison Serv*., No. 16-cv-3927, 2019 WL 1057371, at \*5 (N.D. Ill. Mar. 6, 2019) (finding reliance on ACDVs alone was insufficient to comply with Section 1681i because the plaintiff provided sufficient information to put Equifax on notice that the furnisher was supplying inaccurate information); *see Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005) (discussing *Henson* in an appeal of a summary-judgment ruling, and noting "[b]ecause Experian

had no reason to believe that U.S. Bank was an unreliable source, Experian's period of liability did not begin until December 23, 2002, when it received notice of [plaintiff]'s dispute"). These courts are not alone, as it is largely recognized that "where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation." *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) (collecting cases from the Third and Ninth Circuits so holding).

Courts applying *Henson* look at two factors to determine whether the CRA was duty bound to look at more than what the furnisher was telling it: (1) whether the Plaintiffs informed the CRAs that Ally may have been an unreliable source or the CRAs knew or should have known that; and (2) the cost to the CRA of verifying the accuracy of the information versus the possible harm the inaccurate information could have caused Plaintiffs. *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 606 (7th Cir. 2006). Defendants do not discuss either factor, other than to say they had no reason to believe Ally was an unreliable furnisher. (ECF 186 at 24.) This lack of analysis confirms there are issues of fact as to whether Defendants should have done more with their investigations.

On the first point, Defendants argue just that because a sample of 300 consumers' bankruptcy files that contained Ally accounts in *Myers* revealed just one error, Ally is *per se* reliable. (ECF 186 at 24.) But there is no discussion of whether any of those accounts involved reaffirmation agreements, as did *Myers* and this case. Since between *Myers* and Plaintiffs the CRAs had at least three examples of Ally furnishing questionable information about accounts to which those agreements applied, Defendants were on notice of this specific, identifiable problem with this exact furnisher.

Regarding the cost of verification, the second element of the test, Defendants offer nothing solid about that it would take to verify with Ally whether Plaintiffs' agreements were valid. (*See* ECF 186 at 24.) Defendants therefore resort to hyperbole, arguing "Plaintiffs' suggestion that Defendants should independently review all information provided by furnishers would be untenable and at odds with Congress's goal of creating a credit-reporting system suitable for 'meeting the needs of commerce.'" (*Id.*) That of course is not what Plaintiffs suggest. Instead, Plaintiffs' focus is on verifying just the challenged information, which the FCRA requires that Defendants do when consumers dispute. 15 U.S.C. § 1681i. Defendants provide nothing for the Court to consider that establishes such an inquiry would be prohibitively costly as a matter of law. And, as explained above, Defendants always have the option to delete information they cannot verify, an option that costs virtually nothing. Based on Defendants' failure to meaningfully discuss and address these factors, the Court should decline to grant summary judgment on them.

What Defendants engaged in by sending the ACDVs to Ally and waiting to see its responses as a proxy for their Section 1681i investigations is what courts refer to as "parroting." As one court put it: "The FCRA imposes on CRAs a 'grave responsibility' to refrain from 'merely parroting information received from other sources' where a consumer has alerted it to the possibility that a creditor may be unreliable." *Choudhury v. Citibank, N.A.*, No. 18-cv-02188 (RJD) (ST), 2018 WL 11447942, at *5 (E.D.N.Y. Dec. 7, 2018) (citing *Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d Cir. 1997) and *Henson*, 29 F.3d at 286–87). This outcome is entirely logical, given the long-held notion that "[i]n a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993). Certainly, where Defendants are on notice from multiple disputes from consumers and other litigation involving the

same problem and furnisher, they must do more than simply sit on their hands and await the unreliable furnisher's response. *Crump v. Carrington Mortg. Servs., LLC*, No. 18 C 2302, 2019 WL 118490, at *6 (N.D. Ill. Jan. 7, 2019) ("Once a CRA receives notice that information in a consumer report may be inaccurate, 'the statutory duty [to reinvestigate under § 1681i(a)(1)] click[s] in, and at that point the continued sending of [the contested information] to creditors might be viewed as a failure to maintain reasonable procedures for assuring accuracy' under § 1681e(b).") (quoting *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001), alterations in original); *see also Losch*, 995. F.3d at 946; *Collins*, 775 F.3d at 1331–33; *Dennis*, 520 F.3d at 1068–70.

## IV. Defendants Have Not Shown As A Matter Of Law That A Jury Could Not Conclude They Acted Willfully In Violating Section 1681e(b).

Courts in this Circuit generally hold that willfulness is ill-suited for summary judgment because it involves consideration of Defendants' state of mind. *Fickel v. Clearwater Credit Union*, No. 21-cv-798-SMY, 2023 WL 2456116, at *3 (S.D. Ill. Mar. 10, 2023) ("And whether Clearwater's investigation or protocol may qualify as a willful violation giving rise to statutory or punitive damages is an issue for a jury as well."); *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 3894165, at *6 (N.D. Ill. Sept. 30, 2010) (denying motion for summary judgment on willfulness, and collecting cases supporting the conclusion that willfulness is a jury question). This case should follow that logical conclusion.

### A. Following The *White* Injunction Does Not Save Defendants As A Matter Of Law.

Defendants' principal argument is that their conduct was not willful because they applied the requirements of an agreed-upon injunction entered in earlier litigation styled *White v. Experian Information Solutions, Inc.*, No. 8:05-cv-01070, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008).

(ECF 186 at 30–31.) That order required Defendants to do several things relating to post-bankruptcy debts, including "assume that certain categories of pre-bankruptcy consumer debts have been discharged in Chapter 7 bankruptcies based on the statistical likelihood of discharge of these categories of debt, and without either the affected creditors or Consumers reporting the debt to Defendants as having been discharged." *White*, 2008 WL 11518799, at *13, ¶ 5.1. As Defendants note, this requires them to scrub and "automatically update qualifying pre-bankruptcy debts to report as discharged in bankruptcy without being asked to do so by either a creditor or consumer." (ECF 186 at 30.) But, as Defendants further note, "the *White* Injunction provides only a default rule: when a furnisher reports that a consumer has discharged a debt in bankruptcy, the information supplied by the furnisher controls." (*Id.* at 30–31.) Put another way, as Defendants explain earlier in their brief, "[t]he scrub was not triggered in this case because Ally was already reporting Plaintiffs' account as included in their Chapter 7 bankruptcy." (*Id.* at 6.) So, Defendants did nothing to "comply" with the *White* Injunction because, in their view, nothing was required because Ally was reporting the debt the way it was.

Defendants claim that "courts have consistently found [ ] compliance with the *White* Injunction defeats a consumer's willfulness claims." (*Id.* at 31 (collecting cases).) The problem with this argument and the cases Defendants cite to underpin it is fundamental—Defendants did not do anything the *White* Injunction required other than listen to their furnishers' reporting of the debt in the first instance. That is much different from, for example, complying with the scrub aspect of the Injunction only to be told by the consumer that the reporting was inaccurate. In that circumstance, Defendants could plausibly claim they were relying on the requirements of the Injunction, a prior court order, so there is nothing wrong with having done that in favor of what the consumer was telling them. Here, things are different because the Injunction does not say, and

35

Defendants do not meaningfully argue, that they are without FCRA liability if they repeatedly adopt their furnisher's and reject the consumer's view of how a debt is to be reported post-bankruptcy. All the Injunction says about the way Ally was originally reporting the account is Defendants do not have to scrub that data. The Injunction does not say that Defendants are free to disregard their FCRA accuracy and investigation duties if a consumer tells them something about a post-bankruptcy debt.

Defendants' cited cases bear this conclusion out. None of them deal with a situation like this one, where they had no need to scrub the data from the furnisher. Instead, the majority of cases deal with how something was reported post-scrub. *Coleman v. Experian Info. Sols., Inc.*, __ F. Supp. 3d __, No. 1:21-cv-1095-CAP, 2023 WL 2366609, at *3 (N.D. Ga. Feb. 6, 2023); *Lynch v. Experian Info. Sols., Inc.*, No. 20-cv-2535 (KMM/JFD), 2022 WL 16857078, at *9 (D. Minn. Nov. 10, 2022); *Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998, 1002 (D. Minn. 2022); *Beers v. Experian Info. Sols., Inc.*, No. 20-cv-1797 (WMW/JFD), 2022 WL 891620, at *1 (D. Minn. Mar. 25, 2022); *Laura v. Experian Info. Sols., Inc.*, No. 20-cv-01573, 2022 WL 823853, at *1 (N.D. Ill. Mar. 18, 2022); *Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330, 1348 (N.D. Ga. 2021), *motion for relief from judgment denied*, No. 1:20-cv-2466-RWS, 2022 WL 1690539 (N.D. Ga. Mar. 21, 2022).[4] These decisions are even less helpful to Defendants because, as the

---

[4] Two cases decided by the same judge, *Peterson v. Experian Information Solutions, Inc.*, No. CV 20-606 (DSD/ECW), 2021 WL 3116073, at *4 (D. Minn. July 22, 2021), *aff'd sub nom. Peterson v. Experian Information Solutions*, 44 F.4th 1124 (8th Cir. 2022) and *Campbell v. Experian Information Solutions, Inc.*, No. CV 20-2498(DSD/BRT), 2022 WL 3716982, at *6 (D. Minn. Aug. 29, 2022), do not explain what aspect of the *White* Injunction Experian applied to the plaintiffs' credit files. They therefore add little to the analysis.

Three other cases, again decided by the same judge (although a different judge than *Peterson* and *Campbell*), *Hernandez v. Experian Information Solutions, Inc.*, *Sunseri v. Experian Information Solutions, Inc.*, and *Wheeler v. Trans Union LLC*, saw the Ninth Circuit reverse Experian's victories on motions to dismiss. *Hernandez*, No. LA CV 20-09908-DOC (RAOx), 2021 WL 2325019, at *4 (C.D. Cal. June 4, 2021), *rev'd & remanded*, No. 21-55588, 2022 WL 1315306 (9th Cir. May 3, 2022); *Sunseri*, No. LA CV 20-08932-DOC (RAOx), 2021 WL 2327934, at *3 (C.D. Cal. June 4, 2021), *rev'd & remanded*, No. 21-55583, 2022 WL 1315303 (9th Cir. May 3, 2022); *Wheeler*, No. LA CV 20-11710 DOC (RAOx), 2021 WL 2290575, at *4 (C.D. Cal. June 4, 2021), *rev'd & remanded sub nom. Wheeler v. Experian Info. Sols., Inc.*, No. 21-55585, 2022 WL 1315301 (9th Cir. May 3, 2022).

*Ferrin* court noted, "[t]he Ninth Circuit recently addressed the *White* Order in three cases [*Sunseri*, *Wheeler*, and *Hernandez*], explaining that '[r]easonableness is not a static issue, and procedures that met the high bar of [Section] 1681e(b) fourteen years ago may not today.'" *Ferrin*, 617 F. Supp. 3d at 1007 (first two alterations added). The *Ferrin* court is not alone, with a subsequent decision declining to grant Experian summary judgment on willfulness, where Experian argued it complied with the *White* Injunction. *Bailey v. Experian Info. Sols., Inc.*, No. 1:21-cv-00465-BLW, 2023 WL 6317443, at *10 (D. Idaho Sept. 28, 2023) (noting this same quote from the Ninth Circuit, and refusing to grant summary judgment on willfulness as to one account Experian argued was scrubbed as provided by the *White* Injunction). In those cases, then, the CRAs manipulated the bankruptcy data in a way that complied with the requirements of the Injunction. Yet, in *Bailey* they did not prevail on willfulness. Here, they did not do anything to the bankruptcy data, even after Plaintiffs disputed. Simply citing to *White* and claiming to have followed it is not enough to establish a lack of willfulness, particularly where, like here, Defendants offer solely that argument and no on-point case in support.

### B. Defendants Have Not Shown What Reading Of The FCRA They Adopted And Applied To The Reporting Of Plaintiffs' Ally Account.

The Supreme Court established the standard for FCRA willfulness in *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007). Though *Safeco* came down in 2007, the Court recently revisited that decision's willfulness analysis in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023). That case, brought under the False Claims Act, considered whether pharmacies who submitted claims for reimbursement for drugs provided to Medicare or Medicaid insureds falsely certified those claims as true when the disclosed a higher price for the drugs than the insureds allegedly actually paid. *Id.* at 744–46. According to the plaintiffs, the pharmacies ran a discount program that was popular enough that its discounted prices became, by default, the

pharmacies' "usual and customary" prices. *Id.* at 745–46. Yet, plaintiffs claimed, when the pharmacies sought Medicare or Medicaid reimbursement and were required to submit their "usual and customary" prices, they allegedly used the higher, non-discounted prices. *Id.* at 746–47. If plaintiffs were correct, these claims for reimbursement violated the FCA.

Under the FCA, liability attaches when one "knowingly presents . . . a false or fraudulent claim for payment or approval." 42 U.S.C. § 3729(a)(1)(A). Such a claim has two elements: "(1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *Schutte*, 598 U.S. at 747. In *Schutte* the pharmacies prevailed on summary judgment, with the district court finding the claims submitted were indeed false because they reflected the non-discounted prices but that the pharmacies did not act "knowingly." *Id.* The Seventh Circuit affirmed, relying "heavily" on the *Safeco* willfulness analysis. *Id.* at 748. As the Supreme Court explained:

> [T]he Seventh Circuit read *Safeco* to dictate a two-step inquiry for ascertaining whether a defendant acted recklessly or knowingly. At step one, the Seventh Circuit took Safeco to ask whether a defendant's acts were consistent with any objectively reasonable interpretation of the relevant law that had not been ruled out by definitive legal authority or guidance. This step, the Seventh Circuit held, applied regardless of whether the defendant actually believed such an interpretation at the time of its claims. Only if the defendant's acts were not consistent with any objectively reasonable interpretation would the court proceed, at step two, to consider the defendant's actual subjective thoughts. Thus, under the Seventh Circuit's approach, a claim would have to be objectively unreasonable, as a legal matter, before a defendant could be held liable for "knowingly" submitting a false claim, no matter what the defendant thought.

*Id.* The Seventh Circuit affirmed the grants of summary judgment, finding that the pharmacies' conduct was "consistent with an objectively reasonable interpretation of the phrase 'usual and customary.'" *Id.* The court held the pharmacies *could* have interpreted the phrase to mean their non-discounted prices, even if the correct understanding meant the discounted prices. *Id.* The Seventh Circuit believed that what mattered instead "was that someone else, standing in [the pharmacies]' shoes, may have reasonably thought that the retail prices were what counted." *Id.*

The Supreme Court granted review, framing the question presented as:

> If respondents' claims were false and they actually thought that their claims were false—because they believed that their reported prices were not actually their "usual and customary" prices—then would they have "knowingly" submitted a false claim within the FCA's meaning? Or is the Seventh Circuit correct—that respondents could not have "knowingly" submitted a false claim unless no hypothetical, reasonable person could have thought that their reported prices were their "usual and customary" prices?

*Id.* at 748–49. After discussing the scienter element of the FCA, the Court turned to *Safeco* and the pharmacies' argument that an objective analysis of their conduct controlled. *Id.* at 743.

The Court rejected that argument, holding that "*Safeco* did not purport to set forth the purely objective safe harbor that respondents invoke." *Id*. at 755. Rather, the Court explained, "*Safeco* stated that a person is reckless if he acts '*knowing* or having reason to know of facts which would lead a reasonable man to realize' that his actions were substantially risky." *Id.* (quoting *Safeco*, 551 U.S. at 69, emphasis in original). The Court also noted *Safeco*'s alternative explanation, "the common law of recklessness contained an objective standard because it encompassed actions involving 'an unjustifiably high risk of harm that is *either* known *or* so obvious that it should be known.'" *Id.* (emphasis in original). The Court concluded:

> Thus, as we have stated previously, "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." By a similar token here, *we do not look to legal interpretations that respondents did not believe or have reason to believe at the time they submitted their claims*.

*Id.* at 755 (emphasis added, citation omitted). Thus, the defendant's particular understanding, or "reading" as *Safeco* and *Schutte* put it, of the statute at issue means everything regarding the defendant's state of mind.

*Schutte* confirms that context matters. And it matters more when considering a party's state of mind at some point in the past. Defendants' Motion argues, essentially, "we followed the *White*

injunction" as to Section 1681e(b) and, for Experian, "we thought Plaintiffs did not draft their disputes" as to Section 1681i, so they could not have acted willfully. (ECF 186 at 27–28, 30–31.)[5] Yet, as the Supreme Court pointed out in *Schutte*, whether there is now something Defendants' counsel has unearthed that it can argue objectively supports what Defendants did, that does not preclude a finding that Defendants still knew what they were doing violated the FCRA. *Schutte*, 598 U.S. at 754–55. And, of course, Defendants must show they had some reading of the FCRA they adopted as a defense to willfulness. They have not done so.

Defendants' Motion bears this analysis out. They spill considerable ink explaining authorities they claim support the inaccurate reporting and investigations Experian did not do, but they do not show that they considered any of these things when they implemented the systems to which Plaintiffs were subjected. *Safeco*, as refined by *Schutte*, requires that showing yet Defendants fail to make it. They do not even try. In other words, Defendants ask the Court to grant them summary judgment based on facts or legal authorities Defendants do not show they considered (or even knew about) at the time they implemented the reporting and investigation systems at issue. *Schutte*, 598 U.S. at 755. The Court should not.

### C.     Defendants Have Not Shown Willfulness Lacking As A Matter Of Law As To Their Perfunctory Investigations Of Plaintiffs' Disputes.

#### 1.     Experian has not proven as a matter of law that no reasonable jury could find it was willful in failing to investigate Plaintiffs' disputes.

With the overarching, substantive failure on willfulness for both Defendants set forth above, there is little else to discuss on the point. Experian bases the entire argument on the falsity that Plaintiffs' Counsel is a credit repair organization, an issue on which it has no proof, even now, and therefore Experian was entitled to disregard those disputes entirely. (ECF 186 at 27–28.) These

---

[5] Equifax does not move for summary judgment on the willfulness aspect of Section 1681i.

arguments—that its mail sorting complied with some un-revealed standard and therefore was not willful, is not even supported by Experian's hand-crafted evidence.

At the outset, there is a meaningful difference between the requirement that Experian investigate a dispute, and the problem Experian claims will result without its mail-sorting policy— the providing of consumer reports "to third parties who lack a permissible purpose." (ECF 186 at 29.) Section 1681i requires Experian to investigate all disputes that come from consumers, 15 U.S.C. § 1681i, and nothing permits Experian to inject false barriers into that process. Experian can accomplish the investigation requirement and determine whether it is providing the results to the correct consumer *after* it has investigated. Instead, Experian has chosen a cost-reducing option that it believes allows it to forego disputes entirely when, in reality, it could investigate and then confirm the identity of the person to whom it is providing the results.

Under these circumstances, a reasonable jury could conclude that Experian recklessly violated Section 1681i by relying on some unspecified mail sorting process to inaccurately conclude that Plaintiffs' dispute letters did not come from Plaintiffs. Experian's own declarant cannot explain any specifics that led to Experian's conclusions about the letters, providing such bland explanations as "Experian employees examine outside envelopes and compare them to other mail received, as credit clinics tend to send their mail in bulk, with similar features apparent from the outside." (ECF 183-3 ¶ 22.) What features are those—are they things impossible to be reproduced except by a bulk-mailing house? Or what are the "indications of third-party mail, including that the dispute letters were sent by a third-party mailing house and appeared to have been prepared by someone other than Plaintiffs"? (*Id.*) No one knows, apparently, but Experian would have the Court conclude that Experian has imposed an ironclad, error-free system for identifying such mail that should be interpreted to eminently trustworthy without the need to truly

discuss the details regarding how the system works, what parameters Experian's employees apply in making decisions under the policy, error rate, or anything that would allow the Court to meaningfully analyze it. Nothing about Experian's argument convincingly rules out that by instituting a process for identifying mail that supposedly comes from someone other than a consumer—without any outside verification such as from the consumer himself—Experian "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. 47 at 50.

Separately, yet just as meaningful, nothing to which Experian points conclusively establishes that it did not knowingly violate Section1681i. After all, resorting to its mail-sorting protocol could be a move aimed entirely at cost saving—fewer disputes processed means fewer dollars Experian sinks into that process. So if Experian has a pretextual reason to cull some number of disputes from the list of those it actually investigates, it spends less money. Just as with recklessness, nothing Experian provides about its shadow mail-sorting process confirms that Experian implemented it and did not know doing so would violate Section 1681i.

Experian's summary-judgment loss on willfulness in *Ricketson v. Experian Information Solutions, Inc.*, 266 F. Supp. 3d 1083, 1095 (W.D. Mich. 2017), confirms willfulness should go to the jury here. In *Ricketson*, the plaintiff-consumer disputed inaccurate credit information to Experian in writing, and Experian, like here, determined that letter to be "suspicious" as not coming from plaintiff, and did no Section 1681i investigation at all. *Id*. at 1086–87. Unlike here, Experian claimed its conclusion that the letter was suspicious was a mistake, yet—in keeping with its suspicious mail policy—it sent Ricketson a letter stating it had received a suspicious letter and stated it would not investigate, and asked him to call Experian if he was truly needing to dispute a

debt. *Id.* at 1087. Experian later removed the tradeline on its own, but did not inform Ricketson that it did. *Id.* Ricketson sued, alleging Section 1681e(b) and 1681i claims.

On summary judgment, Experian claimed its application of the suspicious letter process to Ricketson's dispute was a mistake and therefore could not be willful. *Id.* at 1095. Ricketson argued that there were jury questions about "whether [Experian]'s policies and procedures for handling and sorting 'suspicious' mail render its conduct reckless in light of § 1681i's requirements, and therefore willful." *Id.* at 1095–96. In discussing the competing arguments, the court noted that Experian "did not simply ignore Plaintiff's letter after receiving it" but, instead, tried to contact Ricketson and determine its authenticity. *Id.* at 1096. The court sided with Ricketson on summary judgment as to willfulness, finding Experian's claim of mistake was not shown to be a violation of its policies and procedures and, moreover, that Experian did not explain how the policy was an objectively reasonable way to discharge its responsibilities to investigate under Section 1681i. *Id.*

Experian's conduct here differs slightly from *Ricketson* in that Experian simply threw Plaintiffs' disputes in the trash and performed no investigation at all. (ECF 183-3 ¶ 22.) Yet, like *Ricketson*, Experian has not explained how its insufficiently detailed mail-sorting policy assists it in discharging its Section 1681i duties. (*See* ECF 186 at 28–29.) And, more importantly, Experian has not even proven as a matter of law that its mail-sorting policy caused the lack of investigation of Plaintiffs' disputes. Rather, as its witness notes, "Plaintiffs' dispute letters contained such indications of third-party mail, including that the dispute letters were sent by a third-party mailing house and appeared to have been prepared by someone other than Plaintiffs, and, accordingly, were *likely* not processed for reinvestigation." (ECF 183-3 ¶ 22 (emphasis added).) Certainly, to achieve summary judgment as to willfulness on this point, Experian must prove what it *actually did* with Plaintiffs' letters, other than fail to investigate after receiving them. "Likeliness" of

something cannot carry the day on summary judgment, as all reasonable inferences go to Plaintiffs, not Experian. But in line with *Ricketson*, Experian has failed to show how its mail-sorting policy allows it to meet its Section 1681i investigation mandates. This failure by Experian should not result in a summary judgment in its favor as to willfulness.

### 2. Equifax likewise fails to establish that no reasonable jury could find its complete reliance on Ally was willful.

As also noted above, Equifax has not moved for summary judgment on the willfulness element of Plaintiffs' Section 1681i claim. The Court therefore should not grant Equifax's Motion as to that element. *Kreg Therapeutics, Inc. v. VitalGo, Inc*., 919 F.3d 405, 416 (7th Cir. 2019) (noting "[t]he district court could not have erred by not granting summary judgment on grounds that VitalGo failed to raise.").[6]

### CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion for Summary Judgment.

Dated: November 3, 2023

Respectfully submitted,

By:     /s/ *Michael Rapp*
Michael H. Rapp
Matthew S. Robertson
STECKLEIN & RAPP CHARTERED
748 Ann Avenue, Suite 101
Kansas City, Kansas 66101
Phone: (913) 371-0727
Fax:    (913) 371-0727
Email: mr@kcconsumerlawyer.com
          msr@kcconsumerlawyer.com

---

[6] Equifax will no doubt claim that the sentence "Defendants move for summary judgment on Plaintiffs' claims that they allegedly violated § 1681e(b) and willfully violated § 1681e(b) and § 1681i of the FCRA" (ECF 186 at 15) means that it has moved on willfulness as to Section 1681i, but nowhere in Defendants' brief is there any actual argument by Equifax on Section 1681i willfulness. (*See generally id.*) The Court should therefore decline to conclude that this lone statement contains sufficient factual support to garner summary judgment for Equifax on that element. *James M. v. Saul*, No. 20-cv-183, 2021 WL 2820532, at *2 (S.D. Ind. July 7, 2021) (noting "perfunctory and undeveloped arguments are waived").

John T. Steinkamp, #19891-49
JOHN STEINKAMP
5214 South East Street, Suite D-1 Indianapolis,
Indiana 46227
(317) 780 -8300
john@johnsteinkampandassociates.com

Leonard A. Bennett, admitted *pro hac vice*
Craig C. Marchiando, admitted *pro hac vice*
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Email: lenbennett@clalegal.com
        craig@clalegal.com
Telephone: 757-930-3660
Facsimile: 757-930-3662
**Attorneys for Plaintiffs**