UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CRAIG DULWORTH and BRIANNA DULWORTH,  )
  )
    *Plaintiffs*,  )
  )    1:22-cv-00469-JMS-MJD
    *vs.*  )
  )
EXPERIAN INFORMATION SOLUTIONS INC. and  )
EQUIFAX INFORMATION SERVICES, LLC,  )
  )
    *Defendants.*  )

## ORDER

Plaintiffs Craig and Brianna Dulworth filed for bankruptcy protection in October 2018, received a bankruptcy discharge, and reaffirmed an automobile loan from Ally Financial/Ally Bank ("Ally") (the "Ally Loan") as part of the bankruptcy proceeding. Subsequently, they accessed their credit reports from Defendants Experian Information Solutions Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") (collectively, "the CRAs"), and discovered that the Ally Loan was being reported as being included in their bankruptcy and that no payment history was reflected. The Dulworths then initiated this litigation, alleging that the way in which the CRAs reported the Ally Loan violated various provisions of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). The CRAs have filed a Joint Motion for Summary Judgment, [Filing No. 180], and the Dulworths have filed a Motion to Exclude the Declaration of Karen Cobb, [Filing No. 198], both of which are ripe for the Court's consideration.

### I.
### THE DULWORTHS' MOTION TO EXCLUDE THE DECLARATION OF KAREN COBB

In support of their Joint Motion for Summary Judgment, the CRAs submitted a Declaration from Karen Cobb, Litigation Support Lead for Equifax. [Filing No. 183-2.] Because resolution

of the Dulworths' Motion to Exclude will determine whether the Court considers Ms. Cobb's Declaration in connection with the Joint Motion for Summary Judgment, the Court turns first to the Motion to Exclude.

### A.     Standard of Review

Federal Rule of Civil Procedure 26(a)(1)(A) requires, among other things, that "a party must, without awaiting a discovery request, provide to the other parties…the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Under Rule 26(e)(1), a party who has made a disclosure under Rule 26(a) must "supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

The consequences of failing to comply with the disclosure requirements of Rule 26 are set forth in Federal Rule of Civil Procedure 37, which provides that "[i]f a party fails to…identify a witness as required by Rule 26(a)…, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Where failing to identify the witness is not substantially justified or harmless, exclusion is "automatic and mandatory."  *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).  "The party who fails timely to disclose witnesses has the burden to show the failure was harmless or substantially justified; it is not the burden of the moving party to demonstrate prejudice."  *Equal Emp. Opp. Comm'n v. Vill. of Hamilton Pointe LLC*, 2020 WL 1663130, at *2 (S.D. Ind. Jan. 16, 2020).

### B.    Relevant Background

Equifax served its Rule 26 Initial Disclosures on April 28, 2022, identifying the Dulworths, Equifax employee Celestina Gobin "or other designated representative of Equifax, who may be contacted only through Defendant's counsel," and other general categories of individuals such as "[a]ny entity with which [the Dulworths] allege to have applied for credit, employment or insurance." [Filing No. 198-1.]  When asked in an Interrogatory to identify any employees that Equifax "used to process, investigate, or respond to [the Dulworths'] disputes of the accuracy of the Account," Equifax did not identify Ms. Cobb in its August 4, 2022 Objections and Responses to Plaintiffs' First Set of Interrogatories.  [Filing No. 198-2 at 6.]

Equifax also did not list Ms. Cobb in its Witness Lists filed on May 13, 2022, but did list Ms. Gobin "or other designated representative of Equifax" and stated: "An Equifax representative is likely to have information regarding the policies, practices and procedures of Equifax for maintaining credit files and reinvestigating consumer disputes, Plaintiffs' disputes, Equifax's reinvestigations of Plaintiffs' disputes, the contents of Plaintiffs' credit files, and, after reviewing relevant documents, the facts at issue in this case." [Filing No. 30 at 1.]  In its Final Witness List, filed on February 13, 2023, Equifax identified Ms. Gobin and two other Equifax employees – Shetonjela Barber and Pamela Smith – but did not generally designate "[another] designated representative of Equifax." [*See* Filing No. 115.]  Equifax has not moved to amend its Final Witness List.

Discovery closed in this case on August 11, 2023, [Filing No. 132 at 2], and Plaintiffs did not depose Ms. Cobb.  The CRAs then submitted Ms. Cobb's Declaration in support of their Joint Motion for Summary Judgment on October 6, 2023.  [Filing No. 183-2.]  In her Declaration, Ms. Cobb discusses "the procedures that Equifax uses to assure maximum possible accuracy in

gathering, assembling, and storing consumer credit information and to correct errors that are brought to its attention." [Filing No. 183-2 at 3.] She also discusses Equifax's handling of the Dulworths' dispute regarding the reporting of the Ally Loan. [Filing No. 183-2 at 9-11.]

### C.    Discussion

In support of their Motion to Exclude, the Dulworths argue that "there can be no meaningful argument that [they] were not surprised by Equifax's untimely disclosure" of Ms. Cobb as a witness and that they were not able to take any discovery from her during the discovery period. [Filing No. 198 at 4-5.] They assert that Ms. Cobb's Declaration "contains 62 factual statements, and Equifax cites that Declaration more than 40 times, for factual assertions relating to Equifax's data storage and compilation, its relationship with furnishers like Ally, reporting processes that relate to accuracy, Equifax's knowledge of tradeline information like that at issue in this case, reporting of bankruptcy information and supposed industry standards for doing that, [and] Equifax's supposed ability to rely on furnishers like Ally for information." [Filing No. 198 at 5.] The Dulworths contend that their "ability to prepare for a trial opposite a Party who does not comply with the Court's Orders and Rules for disclosing witnesses is categorically prejudiced." [Filing No. 198 at 6.] They argue that the prejudice they have suffered by the late disclosure of Ms. Cobb as a witness cannot be cured and that they "have strategically chosen not to move for summary judgment, based on the state of discovery at the time it closed, only to have Equifax blindside them with wholly new evidence after [they] made that decision and could not reverse it." [Filing No. 198 at 7.] They note that if additional discovery were now allowed, they "would have to completely retool their summary-judgment positions and re-brief the Motion." [Filing No. 198 at 7.] They also argue that although Equifax's untimely disclosure of Ms. Cobb does not affect the trial date, it does "meaningfully impact[ ] summary judgment." [Filing No. 198 at 8.] The

Dulworths assert that Equifax's failure to disclose Ms. Cobb was willful and that the circumstances justify a departure from Local Rule 56-1(i), which discourages collateral motions in the summary judgment process.  [Filing No. 198 at 8-9.]

In its response, Equifax argues that the Dulworths are not prejudiced by the use of Ms. Cobb's Declaration because Equifax identified two other Equifax representatives – Ms. Gobin and Ms. Barber – and the Dulworths did not depose either of those individuals.  [Filing No. 200 at 2.] Equifax argues that its policies and procedures are undisputed and that "[i]f Plaintiffs truly believed that different witnesses would provide differing testimony regarding Equifax's policies and reinvestigation procedures, then they would have certainly deposed every witness identified by Equifax."  [Filing No. 200 at 3.]  Equifax argues that its policies and procedures do not change based on which specific Equifax representative testifies, and states that it is "amenable to exchanging Ms. Cobb's declaration with one signed by Ms. Gobin, an individual specifically named by Equifax in its witness list."  [Filing No. 200 at 3.]  Equifax argues that it sufficiently identified its witness as "other designated representative of Equifax," and "there is no possible tactical advantage Equifax can have over Plaintiffs because Equifax's policies and reinvestigations remain unchanged."  [Filing No. 200 at 3-4.]  Equifax contends that the timing of its disclosure of Ms. Cobb was not willful and that it did not gain any tactical advantage.  [Filing No. 200 at 5.]

In their reply, the Dulworths argue that Rule 26(a)(1) requires the disclosure of actual individuals and not categories of individuals.  [Filing No. 201 at 1-2.]  They assert that Equifax's description of Ms. Gobin's testimony in its disclosures indicates that she was the only person at Equifax who could testify regarding Equifax's policies, practices, and procedures.  [Filing No. 201 at 3.]  They argue further that Equifax seeks to use a Rule 30(b)(6) witness for a declaration, but that "Rule 30(b)(6) only applies to depositions, so by definition it does not apply to declarations

or affidavits." [Filing No. 201 at 4.] They assert that "while Ms. Cobb claims her Declaration is based on her personal knowledge, Equifax destroys that claim by submitting a declaration from Ms. Gobin that is word-for-word identical." [Filing No. 201 at 5.] The Dulworths argue that Equifax has not carried its burden of showing a lack of harm to them and that they are not required "to turn over every stone and depose every witness an opponent does disclose so that [they] can preserve harm arguments that have not yet materialized." [Filing No. 201 at 6.] They assert that Ms. Cobb testifies about more than Equifax's policies and procedures, and that although Equifax maintains that its belated disclosure of Ms. Cobb was not willful, it has not provided any explanation for why it was untimely. [Filing No. 201 at 9.]

There is no dispute that Equifax did not specifically disclose Ms. Cobb as a witness. Instead, it disclosed Ms. Gobin "or other designated representative of Equifax" to testify regarding "the policies, practices and procedures of Equifax for maintaining credit files and reinvestigating consumer disputes, Plaintiffs' disputes, Equifax's reinvestigations of Plaintiffs' disputes, the contents of Plaintiffs' credit file, and, after reviewing relevant documents, the facts at issue in this case." [Filing No. 198-1 at 3.] It also disclosed "Celestine Gobin or other designated representative of Equifax" on its witness list and provided a similar description of the testimony that person would provide as it had included in its Rule 26 disclosures. [Filing No. 30 at 1 ("An Equifax representative is likely to have information regarding the policies, practices and procedures of Equifax for maintaining credit files and reinvestigating consumer disputes, Plaintiffs' disputes, Equifax's reinvestigations of Plaintiffs' disputes, the contents of Plaintiffs' credit files, and, after reviewing relevant documents, the facts at issue in this case.").]

But this failure to specifically disclose Ms. Cobb only warrants exclusion of her Declaration if it harmed the Dulworths. Most telling is the fact that Equifax did disclose Ms.

Gobin, but the Dulworths did not depose her.  Equifax has submitted a Declaration from Ms. Gobin that is identical to Ms. Cobb's Declaration in all material respects.  [Filing No. 200-1.]  While the Dulworths argue that this indicates that Ms. Cobb's Declaration could not have been based on her personal knowledge if Ms. Gobin can aver to the same facts, the Court disagrees.  It is possible – and, in the Court's view, probable – that more than one employee would have personal knowledge of the inner workings of their employer.  Ms. Gobin's Declaration demonstrates that this is the case with Equifax, and that Equifax's failure to specifically name Ms. Cobb as a witness, in light of the Dulworths' failure to depose Ms. Gobin, was harmless.[1]  Accordingly, the Court **DENIES** the Dulworths' Motion to Exclude the Declaration of Karen Cobb.  [Filing No. 198.]

## II.
### THE CRAS' JOINT MOTION FOR SUMMARY JUDGMENT

### A.      Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

---

[1] The Dulworths' failure to depose Ms. Gobin also discredits their argument that they may have decided to move for summary judgment had they known that Equifax would rely on Ms. Cobb as a witness.  It is unclear to the Court how the Dulworths would move for summary judgment without testimony regarding Equifax's internal policies and procedures – information they decided not to pursue when they determined not to depose Ms. Gobin.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is still appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th

Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    Statement of Facts**

The following Statement of Facts is set forth pursuant to the standard detailed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

*1.    The CRAs' Procedures Related to Reporting Bankruptcies*

When a consumer files for bankruptcy, the CRAs receive high level information from public vendors including the consumer's name, the type of bankruptcy filed (*i.e.*, Chapter 7 or Chapter 13), the date the consumer filed for bankruptcy, and the court in which the consumer filed for bankruptcy.  [Filing No. 183-2 at 4; Filing No. 183-3 at 3-4.]  The public vendors will also inform the CRAs when a bankruptcy has been discharged or dismissed.  [Filing No. 183-2 at 4; Filing No. 183-3 at 3-4.]  Public vendors do not provide the CRAs with information regarding particular tradelines.  [Filing No. 183-3 at 3-4.]  The CRAs generally rely on consumers (the debt holder) and data furnishers (*i.e.*, the entity that is owed the debt) to inform them regarding whether an account was discharged in bankruptcy.  [Filing No. 183-1 at 7-8; Filing No. 183-2 at 4; Filing No. 183-2 at 7; Filing No. 183-3 at 3; Filing No. 183-4 at 11-12.]

In addition to relying on data furnishers and consumers to provide bankruptcy discharge information, the CRAs have developed and implemented an automated procedure to update accounts to report as discharged following entry of a Chapter 7 bankruptcy discharge order.  [Filing No. 183-2 at 9; Filing No. 183-3 at 4-5.]  This procedure – called the bankruptcy "scrub" – was

developed pursuant to an injunction entered in *White v. Experian Info. Sol., Inc.*, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) (the "White Injunction").  [Filing No. 183-2 at 9; Filing No. 183-3 at 4.]  Pursuant to the White Injunction, if a furnisher is already reporting to a CRA that an account was included in bankruptcy, the CRA will either retain that reporting during the pendency of the bankruptcy and update the reporting to "discharged in bankruptcy" once the discharge order is entered or simply retain the "included in bankruptcy" status after the discharge.  [Filing No. 183-2 at 9; Filing No. 183-3 at 5.]

a.   Bankruptcy Information From Data Furnishers

Before accepting consumer data from a particular data furnisher, the furnisher goes through a vetting process and the CRAs "will provide consumer reports and accept consumer credit data only from those data furnishers [the CRAs] have determined are reasonably reliable based upon the [CRAs'] own investigation, the data furnisher's reputation in the community, and/or [the CRAs'] longstanding business relationships with them."  [Filing No. 183-2 at 5; *see also* Filing No. 183-3 at 3.]  Each data furnisher signs an agreement certifying that it will comply with all requirements of the FCRA.  [Filing No. 183-2 at 5-6; Filing No. 183-3 at 3.]  The CRAs do not report information from data furnishers that they believe to be unreliable and if at any point the CRAs learn that a data furnisher is not providing accurate information, they would take immediate steps to remediate up to and including terminating the data furnisher as a source of information.  [Filing No. 183-2 at 6; Filing No. 183-3 at 3.]

Data furnishers report information to the CRAs pursuant to an industry-wide manual called the Credit Reporting Resource Guide ("CRRG").  [Filing No. 183-2 at 4; Filing No. 183-3 at 3.]  The CRRG explains that data furnishers are to report accounts that are reaffirmed, included in

bankruptcy, or discharged in bankruptcy through the use of Consumer Information Indicators

("CII").  [Filing No. 183-2 at 5; Filing No. 183-3 at 3.]  For example:

- A CII of "A" indicates that an account was included in a consumer's Chapter 7 bankruptcy petition;

- a CII of "E" indicates that a debt has been discharged in bankruptcy, and the CRAs will not display a recent balance, past-due amount, or current payment amount, and will suppress any post-petition payment information the data furnisher has reported; and

- a CII of "R" indicates that an account was reaffirmed in bankruptcy, and the CRAs will continue to display the balance and payment information for that tradeline, or will update the account to reflect that information if it was previously being reported as "A" or "E."

[Filing No. 183-2 at 5; Filing No. 183-3 at 4.]

> b.      Bankruptcy Information from Consumers

The CRAs also rely on consumers to inform them if the consumer believes the information

on their credit report is inaccurate.  [Filing No. 183-2 at 6; Filing No. 183-3 at 4.]  If a consumer

contacts the CRAs and provides either inadequate documentation or no documentation at all to

support their claim that an account should be reported as reaffirmed in bankruptcy, the CRAs will

thoroughly review the dispute and any supporting documentation and then contact the data

furnisher to verify the accuracy of its reporting through the Automated Consumer Dispute

Verification ("ACDV") process.  [Filing No. 183-1 at 12; Filing No. 183-2 at 6; Filing No. 183-3

at 5; Filing No. 183-4 at 18.]  If the data furnisher then informs the CRAs that the account should

report as reaffirmed, the consumer's credit report will be updated accordingly.  [Filing No. 183-1

at 12; Filing No. 183-2 at 6; Filing No. 183-3 at 5.]

> 2.      The Dulworths' Ally Loan and Chapter 7 Bankruptcy

On July 27, 2018 the Dulworths took out the Ally Loan, which was secured by a 2016 Kia

Sedona.  [Filing No. 181-1 at 39-40; Filing No. 181-1 at 106-07.]  Three months later, on October

12, 2018, the Dulworths filed a joint Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Southern District of Indiana.  [Dkt. 1 in *In re: Craig Scott Dulworth and Brianna Lashell Dulworth*, No. 18-07856-JMC-7 (Bankr. S.D. Ind.) (the "Bankruptcy Petition"); Filing No. 181-2; Filing No. 181-3.]

The Bankruptcy Petition listed two creditors holding secured claims – Ally (secured by the 2016 Kia Sedona) and One Main (secured by a 2006 Chevy Silverado).  [Filing No. 181-3 at 20.] The Dulworths wanted to reaffirm the Ally Loan so that Brianna Dulworth could use the 2016 Kia Sedona to get to and from work.  [Filing No. 181-1 at 42-43.]  On December 20, 2018, Ally filed in the Bankruptcy Court a Reaffirmation Agreement that it had entered into with the Dulworths which required the Dulworths to make regular payments of $449.90 per month over the course of 74 months beginning on November 25, 2018.  [Filing No. 181-1 at 50; Filing No. 181-4 at 2.]  The Reaffirmation Agreement outlined various obligations for the Dulworths and stated that if those obligations were not satisfied, "the reaffirmation agreement is not effective, even though you have signed it."  [Filing No. 181-4 at 8.]  It also stated that the Dulworths could "rescind (cancel)" the Reaffirmation Agreement by providing notice to Ally "at any time before the bankruptcy court enters [the] discharge, or during the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later."  [Filing No. 181-4 at 8.]  The Dulworths' attorney signed the Reaffirmation Agreement on November 16, 2018, the Dulworths signed it on December 4, 2018, and an Ally representative signed it on December 11, 2018.  [Filing No. 181-1 at 7.]

On January 15, 2019, the Bankruptcy Court entered an Order discharging the Dulworths' Chapter 7 bankruptcy.  [Filing No. 181-5 at 6-7.]  The Discharge Order stated that "[m]ost…but not all" debts are covered by the discharge, but the Discharge Order did not include a list of the

Dulworths' discharged and reaffirmed debts.  [Filing No. 181-5 at 6.]  The Discharge Order further stated that creditors could not "make any attempt to collect a discharged debt" and explained that the bankruptcy discharge "does not prevent the debtors from paying any debt voluntarily or from paying reaffirmed debts according to the reaffirmation agreement."  [Filing No. 181-5 at 6.]  The Discharge Order stated that it was "only a general summary of the bankruptcy discharge," and that because "some exceptions exist" and "the law is complicated," "you should consult an attorney to determine the exact effect of the discharge in this case."  [Filing No. 181-5 at 7 (emphasis omitted).]

### 3.    *The CRAs' Reporting of the Ally Loan*

The Dulworths maintained current payments on the Ally Loan.  [Filing No. 195-3 at 5.] Approximately two and a half years after the Bankruptcy Court issued the Discharge Order, the Dulworths obtained copies of their credit reports from the CRAs and discovered that Equifax was reporting the Ally Loan as included in bankruptcy with no payment history and Experian was reporting the Ally Loan as discharged through bankruptcy and never late.  [*See* Filing No. 72 at 2-3; Filing No. 183-2 at 9; Filing No. 183-3 at 4.]  The CRAs were not reporting a monthly payment amount of any balance on the Ally Loan because Ally reported to the CRAs that the Ally Loan was included in the Dulworths' Chapter 7 bankruptcy and the CRAs relied on that reporting.  [*See* Filing No. 183-2 at 5; Filing No. 183-2 at 9; Filing No. 183-3 at 4-5.]  Additionally, the tradeline was not scrubbed pursuant to the White Injunction.  [*See* Filing No. 183-2 at 9; Filing No. 183-3 at 5.]  The CRAs were also reporting the Dulworths' discharged Chapter 7 bankruptcy public record.  [Filing No. 183-2 at 7; Filing No. 183-3 at 3.]

- 13 -

4.    *The Dulworths' Disputes to Equifax and Equifax's Reinvestigation*

The Dulworths reached out to Ally "[u]p to seven [times]" in an effort to have Ally change its reporting of the Ally Loan and, once they realized Ally would not change its reporting, they hired counsel to assist them with sending disputes to the CRAs.  [Filing No. 181-1 at 84-85; Filing No. 181-1 at 89-90.]  The Dulworths hired Stecklein and Rapp Chartered to represent them, and in September 2021, the Dulworths (on their own and not through their attorney) each submitted identical dispute letters to Equifax (the "September 2021 Disputes").  [Filing No. 183-2 at 9-10; Filing No. 181-11; Filing No. 181-12.]  In the September 2021 Disputes, the Dulworths stated that Equifax was incorrectly reporting the Ally Loan as included in bankruptcy with no payment history because the account was reaffirmed in bankruptcy.  [Filing No. 183-2 at 9-10; Filing No. 181-10; Filing No. 181-11.]   The September 2021 Disputes included a copy of the Reaffirmation Agreement that was filed with the Bankruptcy Court.  [Filing No. 181-10 at 8-13; Filing No. 181-11 at 8-13.]  After receiving the September 2021 Disputes and after locating the Dulworths' credit files, Equifax opened a case for each of the Dulworths to track the reinvestigation.  [Filing No. 183-2 at 9-10.]

The Equifax agent who reviewed Brianna Dulworth's September 2021 Dispute did not contact Ally via ACDV as required by Equifax's policies and procedures and it appears from Equifax's records that the agent misinterpreted Brianna Dulworth's dispute.  [Filing No. 183-1 at 22; Filing No. 183-2 at 9-10.]  In any event, the agent addressed the Ally Loan and confirmed that it was reporting as included in bankruptcy.  [Filing No. 182-1; Filing No. 183-1 at 22-23; Filing No. 183-2 at 10.]

The Equifax agent who reviewed Craig Dulworth's September 2021 Dispute notified Ally via the ACDV process and requested that Ally investigate the account and verify whether the Ally

Loan was reaffirmed in the bankruptcy.  [Filing No. 183-2 at 10.]  After investigating, Ally advised Equifax that the Ally Loan was accurately reporting as included in bankruptcy.  [Filing No. 183-2 at 10.]  On October 12, 2021, Equifax informed Craig Dulworth of the results of its investigation and verified that the account was correctly reporting as included in bankruptcy.  [Filing No. 183-2 at 10.]

Equifax received a second dispute from Brianna Dulworth in December 2021 (the "December 2021 Dispute").  [Filing No. 183-2 at 10-11.]  In the December 2021 Dispute, Brianna Dulworth stated that the Ally Loan continued to report inaccurately and re-submitted the Reaffirmation Agreement that was filed with the Bankruptcy Court.  [Filing No. 181-12; Filing No. 183-2 at 11.]  The Equifax agent who reviewed the December 2021 Dispute notified Ally via the ACDV process and requested that Ally investigate the account and verify whether the account was reaffirmed in bankruptcy.  [Filing No. 183-2 at 11.]  Ally returned its investigation results and advised that the account was accurately reporting as included in bankruptcy and Equifax advised Brianna Dulworth of the results of the investigation and verified that the account was correctly reporting as included in bankruptcy.  [Filing No. 183-2 at 11.]  Equifax did not take any additional actions to investigate the status of the Ally Loan.  [Filing No. 195-4 at 24-25.]

5.    *The Dulworths' Disputes to Experian and Experian's Reinvestigation*

The Dulworths claim that they sent letters to Experian dated September 7, 2021 and November 1, 2021 disputing Experian's reporting of the Ally Loan.  [Filing No. 183-3 at 5-6.]  But as Experian investigated the matter, it discovered that the disputes were identified by Experian as not originating from the Dulworths, so they were not processed pursuant to Experian's mail processing procedures.  [Filing No. 183-3 at 6.]  Specifically, Experian's Global Security Policy was implemented to evaluate mail it receives and to differentiate between disputes actually sent

from a consumer or their attorney versus those sent by third parties, including credit clinics.  [Filing No. 183-3 at 6.]  Under the Global Security Policy, Experian employees evaluate outside envelopes and compare them to other mail received because third parties tend to send their mail in bulk, with similar features apparent from the outside.  [Filing No. 183-3 at 6.]  Letters identified as likely sent by a third party or credit clinic are then opened and reviewed to determine if they appear to have been sent directly by a consumer.  [Filing No. 183-3 at 6.]  If they are sent by a consumer or an attorney representing a consumer, Experian processes that mail according to the requirements of the FCRA.  [Filing No. 183-3 at 6.]  If they are sent by a third party or credit clinic, Experian does not process those letters as disputes.  [Filing No. 183-3 at 6.]  The dispute letters the Dulworths claim to have sent to Experian were identified by Experian as third-party mail and, consequently, Experian did not conduct a further reinvestigation.  [Filing No. 183-3 at 6.]

Approximately one month after the Dulworths initiated this litigation (which originated in Johnson Superior Court and was removed to this Court, [Filing No. 1]), and before Ally was named as a Defendant, Experian notified Ally of the Dulworths' disputes via the ACDV process and requested that Ally investigate the Ally Loan and verify whether the account was reaffirmed in bankruptcy.  [Filing No. 183-3 at 5.]  Ally returned its reinvestigation results and advised Experian that the Ally Loan was accurately reported by Experian as discharged in bankruptcy.  [Filing No. 183-3 at 5.]

6.    *The Dulworths' Claimed Damages*

The Dulworths acknowledge that following the discharge of their Chapter 7 bankruptcy, the bankruptcy filing had harmed their credit and they were not surprised when several applications for new credit cards and loans were denied or came with unfavorable interest rates.  [Filing No. 181-1 at 8-10; Filing No. 181-1 at 57; Filing No. 181-1 at 69.]  Specifically, after the discharge of

their Chapter 7 bankruptcy, the Dulworths attempted to obtain an automobile loan through a car dealership and, during the application process, received two sets of denials dated July 17, 2021 and July 24, 2021 from Teachers Credit Union that were based on their Equifax credit file. [Filing No. 181-1 at 97-98; Filing No. 183-5 at 2-3; Filing No. 183-5 at 7-8.] The denials dated July 17, 2021 were not straight denials and only stated that the lender was unable to offer the Dulworths credit on the terms requested due to an "[i]nsufficient credit file after Bankruptcy." [Filing No. 183-5 at 2-3.] The July 17, 2021 denials offered the Dulworths a loan with alternative terms, which they did not accept. [Filing No. 181-1 at 121; Filing No. 183-5 at 2-3.] The denials dated July 24, 2021, however, did not provide alternative terms but stated that the principal reasons for credit denials were "[b]ankruptcy" and "[i]nsufficient credit file after Bankruptcy." [Filing No. 183-5 at 7-8.] The denial letters did not reference the reporting of any specific account as discharged in the Dulworths' bankruptcy or the Ally Loan at issue. [Filing No. 183-5.] Despite these letters, the Dulworths still obtained an automobile loan through Capital One Finance in July 2021. [Filing No. 181-1 at 99.]

The Dulworths claim that they have suffered emotional and mental anguish, frustration, and annoyance. [Filing No. 182-6 at 9-10; Filing No. 182-7 at 8-9.] Brianna Dulworth experienced sadness and embarrassment associated with filing for bankruptcy, and frustration with the repeated attempts to convince Ally that the Ally Loan was reaffirmed and that it should be reported to the CRAs as reaffirmed. [Filing No. 181-1 at 30-32; Filing No. 181-1 at 83-85.] Brianna Dulworth discussed her stress related to her attempts to convince Ally to report the Ally Loan as reaffirmed with her family doctor, but neither she nor Craig Dulworth sought medical treatment as a result of the CRAs' reporting of the Ally Loan, nor is there any evidence that they spoke to a mental health professional. [Filing No. 181-1 at 135-36; Filing No. 182-7 at 9.]

7.     *The Lawsuit*

The Dulworths originally filed suit in Johnson Superior Court, and Experian removed the case to this Court on the basis of federal question jurisdiction.  [Filing No. 1.]  In their operative Second Amended Complaint, the Dulworths assert claims against the CRAs for willfully and negligently: (1) violating § 1681e(b) of the FCRA by not following reasonable procedures to assure maximum possible accuracy of their reporting; and (2) violating § 1681i of the FCRA by failing to conduct a reasonable reinvestigation of the Dulworths' disputes.  [Filing No. 72 at 5-8.]  Specifically, the Dulworths allege that the CRAs erroneously reported the Ally Loan as "'INCLUDED IN BANKRUPTCY' with no payment history" or "Discharged through Bankruptcy Chapter 7/Never late" when the account was actually reaffirmed and they were making payments toward the balance of the loan after the bankruptcy discharge.  [Filing No. 72 at 2-3.]  The Dulworths allege that they submitted disputes to the CRAs regarding the erroneous reporting, but that the CRAs continued to report the Ally Loan as included in bankruptcy and discharged through bankruptcy.  [Filing No. 72 at 3-4.]  The Dulworths seek actual damages, statutory damages, punitive damages, costs, and attorneys' fees.  [Filing No. 72 at 7.]

**C.     Discussion**

1.     *Standing*

Before the Court considers the substance of the Dulworths' claims, it must determine whether they have standing to sue, which is a jurisdictional requirement.  *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1189 (7th Cir. 2021) (courts "have independent obligation to inspect, and remain within, jurisdictional boundaries") (quotation and citation omitted).  Standing is a threshold issue, and the Court must discuss it at the outset.  *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).  To have standing to sue in federal court under Article III,

- 18 -

a plaintiff must establish: "(i) that he [or she] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"Because standing is an essential ingredient of subject-matter jurisdiction, it must be secured at each stage of the litigation." *Bazile*, 983 F.3d at 278. Although at the pleading stage "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, "[o]nce the allegations supporting standing are questioned as a factual matter – either by a party or by the court – the plaintiff must support each controverted element of standing with 'competent proof,'" *Bazile*, 983 F.3d at 278 (quoting *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). "Competent proof" means "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).

The parties do not explicitly address whether the Dulworths have standing, but the CRAs argue in their Joint Motion for Summary Judgment that the Dulworths have not presented evidence that the CRAs' reporting of the Ally Loan as discharged, rather than the Dulworths' poor credit history and bankruptcy discharge, caused them any injury in fact. [Filing No. 186 at 19-23.] The CRAs note the Dulworths' testimony that they knew filing for bankruptcy would damage their credit for years and make it difficult to obtain credit. [Filing No. 186 at 19-20 (citing Filing No. 181-1 at 7; Filing No. 181-1 at 25-26; Filing No. 182-9 at 7).] They assert that although the Dulworths received eleven denial letters in total (the "Credit Denial Letters"), they have not presented any evidence that the denials were connected to the CRAs' reporting of the Ally Loan. [Filing No. 186 at 21.] They argue that seven of the Credit Denial Letters relied on information

from Trans Union, another credit reporting agency that is not a party in this lawsuit, and that although four of the letters refer to receiving information from Equifax, none reference the Dulworths' outstanding debts or the Ally Loan as a reason for the denial. [Filing No. 186 at 21.] The CRAs note that the four letters referencing Equifax provide the following reasons for denial: "Bankruptcy" and "[i]nsufficient credit file after Bankruptcy." [Filing No. 186 at 21 (citing Filing No. 183-5 at 2-3; Filing No. 183-5 at 7-8).] The CRAs argue that, in any event, the Dulworths were able to obtain an automobile loan "almost immediately" after the Credit Denial Letters. [Filing No. 186 at 21.] They also assert that the Dulworths have not provided any credit denial letters linked to information reported by Experian. [Filing No. 186 at 21.] As for emotional distress damages, the CRAs argue that any distress the Dulworths suffered was due to the filing of their bankruptcy and their efforts to get Ally to change its reporting of the Ally Loan to the CRAs, and not due to any actions of the CRAs. [Filing No. 186 at 21-22.] They also argue that "the garden-variety stresses that [the Dulworths] claim to have experienced are exactly the sort that courts in the Seventh Circuit reject as failing to meet the Seventh Circuit's strict standard for a finding of emotional damage because they are so easy to manufacture." [Filing No. 186 at 22 (quotation and citation omitted).]

In their response,[2] the Dulworths focus on the emotional distress damages they claim they have suffered, including Brianna Dulworth's high blood pressure and anxiety, sadness and depression, overwhelming stress, and frustration with the dispute process and the CRAs; and Craig

---

[2] The CRAs note that the Dulworths' response, after subtracting pages used for the table of contents and table of authorities, exceeds the 35-page limit for response briefs by 6 pages, and request that the Court not consider arguments "after the 39-page mark." [Filing No. 199 at 3.] The Court acknowledges that the Dulworths' response brief does not comply with the 35-page limit set forth in Local Rule 7-1(e), but will consider the Dulworths' arguments made outside of the page limit since the arguments made in the last 6 pages are not outcome-determinative. The Court cautions counsel, however, that it must comply with all Local Rules going forward.

Dulworth feeling frustrated and helpless that no one would assist them with correcting the misreporting.  [Filing No. 196 at 23-25.]

The CRAs argue in their reply that the Dulworths do not dispute that the CRAs' reporting of the Ally Loan did not cause them any credit harm.  [Filing No. 199 at 10.]  They reiterate their argument that any emotional distress the Dulworths suffered was attributable to their bankruptcy proceeding and Ally's actions.  [Filing No. 199 at 10-11.]

The Court agrees that the Dulworths ignore the CRAs' arguments regarding a lack of actual damages from their reporting of the Ally Loan – both that the Dulworths have not presented any evidence that the credit denials based on information from Equifax were due to Equifax's reporting of the Ally Loan and that none of the credit denials the Dulworths produced were based on information from Experian.  Consequently, the Dulworths have waived any argument in opposition. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver.").

Additionally, the evidence the Dulworths point to in support of their claim that they suffered emotional distress damages relates to the filing of their bankruptcy or their failed efforts to get Ally to change how it was reporting the Ally Loan to the CRAs – and not to the actions of the CRAs.  [*See, e.g.*, Filing No. 194-4 at 17-18 (Brianna Dulworth testifying regarding emotional distress "from Ally's reporting"); Filing No. 194-5 at 4 (Craig Dulworth testifying that he was aggravated due to not being able to get credit and was "trying to fix the problem" by applying for credit).]  The only evidence the Dulworths point to regarding the CRAs' actions is testimony from Brianna Dulworth that she did not follow through with the CRAs regarding her dispute of the reporting of the Ally Loan because she "was frustrated."  [Filing No. 194-4 at 11.]  The Court finds that Brianna Dulworth's vague reference to feeling frustrated is not sufficient to show that the

- 21 -

Dulworths suffered emotional distress as a result of the CRAs' actions. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004) (The Seventh Circuit imposes a "strict standard for a finding of emotional damage because [accounts of emotional distress] are so easy to manufacture.") (quotation and citation omitted); *see also Laura v. Experian Info. Sols., Inc.*, 2022 WL 823853, at *3 (N.D. Ill. Mar. 18, 2022) (plaintiff's conclusory assertion that she experienced frustration, despair, and hopelessness after CRA's inaccurate reporting was not sufficient to support emotional distress damages).

Even though the Dulworths have not presented any evidence that they suffered actual damages for purposes of recovering for a negligent violation of the FCRA under §1681o, they can still seek statutory and punitive damages under § 1681n for a willful violation of the FCRA. *See Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 725 (7th Cir. 2016) ("Each willful violation entitles consumers to recover either 'any actual damages sustained…as a result' of the violation or statutory damages of between $100 and $1,000.") (quoting 15 U.S.C. § 1681n(a)(1)(A)). The Dulworths still must show, however, that they suffered an injury-in-fact in order to seek redress for a willful violation. *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 93 n.2 (1st Cir. 2022) ("Even without a showing of actual damages, a plaintiff who seeks to press a willful noncompliance claim [under the FCRA] must show an injury in fact sufficient to support standing.") (citing *Trans Union LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021)).

In *Spokeo, Inc. v. Robins*, the Supreme Court held that a "bare procedural violation [of the FCRA] divorced from any concrete harm" does not satisfy the injury-in-fact requirement of Article III." 578 U.S. 330, 341 (2016). The Supreme Court also found, however, that "the risk of real harm" can satisfy the requirement of concreteness where the violation of the FCRA is of a right granted by the statute and the plaintiff "need not allege any additional harm beyond the one

- 22 -

Congress has identified." *Id.* at 342 (emphasis omitted).  Subsequently, the Supreme Court held that a plaintiff has standing to sue for an FCRA violation where a misleading credit report was provided to a third party, because this dissemination constituted "concrete reputational harm." *Ramirez*, 141 S. Ct. at 2200; *see also Chuluunbat v. Experian Info. Solutions, Inc.*, 4 F.4th 562, 566 n.3 (7th Cir. 2021) (plaintiffs had standing to assert FCRA claims where they had all alleged that their credit reports were accessed by third parties).

The record evidence in this case, which consists of the Credit Denial Letters, shows that Equifax disseminated the Dulworths' credit reports to third parties during the time that the Ally Loan was being reported as included in bankruptcy instead of reaffirmed.  [*See* Filing No. 183-5 at 2-3 (letters to the Dulworths denying auto loan based on information received from Equifax).] Under *Spokeo* and *Ramirez*, the Court finds that, because Equifax disseminated the Dulworths' allegedly inaccurate credit reports to third parties, they have standing to assert their FCRA claims against Equifax.

There is no record evidence, however, showing that Experian disseminated the Dulworths' credit reports to third parties when it was reporting the Ally Loan as discharged through bankruptcy instead of reaffirmed.  None of the Credit Denial Letters reference Experian, [Filing No. 183-5], and the Dulworths do not set forth any additional evidence showing – nor do they even argue in their response brief – that third parties received their Experian credit report during this time. Accordingly, under *Spokeo* and *Ramirez*, the Dulworths do not have standing to assert their FCRA claims against Experian and those claims are **DISMISSED WITHOUT PREJUDICE**.[3]  The

---

[3] A dismissal for lack of jurisdiction is without prejudice.  *See Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 661 (7th Cir. 2011).

Court also **DENIES AS MOOT** the CRAs' Joint Motion for Summary Judgment, [Filing No. 180], as to the Dulworths' claims against Experian.

The Court goes on to consider the parties' arguments regarding the claims against Equifax.

> 2.   *Whether Equifax Violated § 1681e(b)*

The Dulworths claim that Equifax negligently and willfully violated the FCRA.  For a negligent violation, the Dulworths must show that they suffered actual damages in order to recover. 15 U.S.C. § 1681o.  As discussed above, they have not made such a showing and their claim for a negligent violation of § 1681e(b) fails as a matter of law.

As to a willful violation, the Dulworths must show that Equifax acted "with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195 (7th Cir. 2021) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). This "raises a sequencing issue," where "[c]ourts may pass over the antecedent question of whether a violation occurred, moving directly to whether the defendant negligently or willfully violated the statute," which "is akin to the sequencing dilemma courts face in qualified immunity cases." *Persinger*, 20 F.4th at 1195.  The Court will follow the Supreme Court's approach in *Safeco* and the Seventh Circuit's approach in *Persinger*, however, and first consider whether Equifax has violated the FCRA.

15 U.S.C. § 1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  In order for the Dulworths to succeed on their FCRA claim, they must show that Equifax's consumer report contained inaccurate information.  *See Walton v. BMO Harris Bank N.A.*, 761 Fed. App'x 589, 591 (7th Cir. 2019) (holding that a CRA "cannot be held liable as a threshold matter [under § 1681e(b)] if it did

not report inaccurate information").  Additionally, the FCRA "is not a strict liability statute," *id.* at 592, and "does not require unfailing accuracy from consumer reporting agencies," *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020).  If a CRA followed "reasonable procedures to assure maximum possible accuracy" of a consumer's information, but reported inaccurate information anyway, it is not liable under the FCRA.  *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).  Additionally, "[n]either the FCRA nor its implementing regulations impose a…duty [upon CRAs] to determine the legality of a disputed debt." *Denan*, 959 F.3d at 295.

Equifax argues that it did not violate § 1681e(b) for two reasons: (1) determining whether the Ally Loan was successfully reaffirmed and, consequently, inaccurately reported, would require the type of legal analysis that it is not obligated to undertake; and (2) it was entitled to rely on information furnished by Ally.  The Court considers each reason in turn.

> a.  Whether Reporting the Reaffirmation Required a Legal
> Determination That Equifax Was Not Obligated to Undertake

In support of its Joint Motion for Summary Judgment, Equifax argues that the Dulworths' claims "present legal issues related to the validity of their reaffirmation agreement with Ally that are not suitable for resolution by [the CRAs]." [Filing No. 186 at 18.] It notes that the only parties to the Reaffirmation Agreement are the Dulworths and Ally, "and the record evidence shows that they disagreed as to whether the debt was discharged" – with the Dulworths claiming that the Ally Loan was not discharged and Ally claiming that the Ally Loan was accurately reported as included in the bankruptcy with no payment history.  [Filing No. 186 at 18.]  Equifax asserts that determining whether the Reaffirmation Agreement was "an enforceable contract between a furnisher and a consumer turns on complex questions of bankruptcy law that far exceed the competencies of consumer reporting agencies." [Filing No. 186 at 18 (quotations and brackets omitted).]  It argues that determining whether the Reaffirmation Agreement was valid would

- 25 -

require it to "consider the facts surrounding the [Reaffirmation Agreement] in light of applicable bankruptcy law." [Filing No. 186 at 18.]  It contends that the Dulworths could have gone to the Bankruptcy Court and obtained an order that resolved their dispute with Ally and that, if they had, the enforceability of the Reaffirmation Agreement would have become a question of fact instead of a question of law.  [Filing No. 186 at 18-19.]

In their response, the Dulworths argue that the CRAs "make and report legal conclusions constantly when it suits them, but when they are sued…and want to avoid liability [they] retreat to the legal/factual distinction that has some traction in courts, but no basis whatsoever in the statute." [Filing No. 196 at 15.]  They assert that the CRAs could have included a notation on their credit reports that the Dulworths were making payments pursuant to an agreement even if the CRAs had doubts about the agreement's validity, noting that the CRAs possessed the Reaffirmation Agreement.  [Filing No. 196 at 15.]  They contend that they are claiming that they owe a debt and that fact is being reported inaccurately, and that they are not collaterally attacking anything.  [Filing No. 196 at 17.]  The Dulworths note that the CRAs do not need to determine the validity of the Reaffirmation Agreement, and only need to know whether it existed and that when they learned it existed, "the FCRA obligated them to do something about what they were reporting so that it was maximally accurate." [Filing No. 196 at 18.]  The Dulworths argue that the CRAs "want the Court to conclude that relying on the furnisher was reasonable as a matter of law when [the CRAs] knew they had conflicting information about the Ally Loan and might have resolved the confusion by checking the bankruptcy docket."  [Filing No. 196 at 20.]  They assert that the CRAs "are statutorily obligated to get things right," and that "[p]erhaps if [bankruptcy] is so complex and difficult, [the CRAs] should stop including it in the reports they make so much money selling." [Filing No. 196 at 22-23.]

In its reply, Equifax reiterates its argument that it received information from Ally regarding the Ally Loan and that "any further investigation beyond confirming what Ally had already reported would have required [it] to determine whether the [R]eaffirmation [A]greement was legally valid." [Filing No. 199 at 4.]  It notes that "legal disputes must be adjudicated and, as a result, are beyond the scope of [the CRAs'] abilities." [Filing No. 199 at 4.]  Equifax contends that the cases the Dulworths rely upon all involved "binding and verifiable filings that were placed on the bankruptcy docket," whereas in this case the issue is whether the Reaffirmation Agreement was valid.  [Filing No. 199 at 4-5.]

In *Denan v. Trans Union LLC*, the Seventh Circuit Court of Appeals considered whether a CRA had violated § 1681e(b) when it reported a debt that the consumer argued was illegally issued, but that the creditor had verified.  959 F.3d 290 (7th Cir. 2020).  In finding that the CRA had not violated § 1681e(b), the Seventh Circuit explained the role of furnishers and CRAs as follows:

> The FCRA imposes duties on consumer reporting agencies and furnishers in a manner consistent with their respective roles in the credit reporting market. Furnishers – such as banks, credit lenders, and collection agencies – provide consumer data to consumer reporting agencies.  In turn, those agencies compile the furnished data into a comprehensible format, allowing others to evaluate the creditworthiness of a given consumer.   Consumer reporting agencies and furnishers, though interrelated, serve discrete functions: furnishers report data to incentivize the repayment of debts, while consumer reporting agencies compile and report that data for a fee.  What results is a credit reporting system, producing a vast flow and store of consumer information.  For example, according to the Consumer Financial Protection Bureau, each of the nationwide consumer reporting agencies receive information from furnishers on over 1.3 billion consumer credit accounts or trade lines on a monthly basis.

*Id.* at 294.  The Seventh Circuit went on to note that requiring a CRA to "verify [a consumer's] debt liability" would "attempt to graft responsibilities of data furnishers and tribunals onto a consumer reporting agency.  Only furnishers are tasked with accurately reporting liability.  And it makes sense that furnishers shoulder this burden: they assumed the risk and bear the loss of unpaid

debt, so they are in a better position to determine the legal validity of a debt…. [CRAs] collect consumer information supplied by furnishers, compile it into consumer reports, and provide those reports to authorized users." *Id.* at 295 (citations omitted).  It concluded that determining the validity of the plaintiff's debt involved three legal issues – whether the choice-of-law provision in the loan agreements was enforceable, whether the loans were void under applicable state laws, and whether tribal sovereign immunity shielded various parties from the application of those states' laws – and that "[t]he power to resolve these legal issues exceeds the competencies of consumer reporting agencies." *Id.*

While cases refusing to impose a duty on CRAs to determine the legality of a debt generally involve questions of the validity of the debt, the Court finds the situation here – determining the validity of the Reaffirmation Agreement – to be analogous.  As the Seventh Circuit has explained, factual issues for which CRAs are responsible to accurately report include, for example, "the amount a consumer owes, and what day a consumer opened an account or incurred a payment." *Chuluunbat*, 4 F.4th at 569.  In contrast, a legal issue requires a CRA to "make [a] legal determination[ ] about the facts or legal judgments." *Id.*  Here, it is true that the filing of the Reaffirmation Agreement is a factual issue, ascertainable from a quick review of the Dulworths' bankruptcy docket.  But the mere filing of the Reaffirmation Agreement does not necessarily mean that it was valid.  Indeed, Ally told the CRAs that the Ally Loan had not been reaffirmed and was accurately reporting as included in bankruptcy.  And the Reaffirmation Agreement provided that it would cease to be effective if the Dulworths did not follow various instructions contained therein. It also stated that the Dulworths could rescind the Reaffirmation Agreement by providing notice to Ally before the Bankruptcy Court entered the discharge or during the 60-day period beginning on the date the Reaffirmation Agreement was filed with the Bankruptcy Court, whichever occurred

later.  [Filing No. 181-4 at 8.]  Any further determination regarding the Reaffirmation Agreement's validity would require Equifax to delve into applicable bankruptcy rules and contract law to answer that question – including whether either of those scenarios had occurred after the Reaffirmation Agreement was filed in the Bankruptcy Court.  This is a legal determination that would require the CRAs to apply law to the facts, that "exceeds the competencies" of the CRAs, and that is one which the CRAs are not required to make under the FCRA.  *Denan*, 959 F.3d at 295.  Accordingly, the Court finds that Equifax did not violate § 1681e(b) by reporting the Ally Loan as discharged instead of reaffirmed.

              b.        <u>Whether Equifax Was Entitled to Rely Upon Information From Ally</u>

Equifax argues in support of its Joint Motion for Summary Judgment that CRAs "comply with § 1681e(b) as a matter of law by reporting information provided to them by furnishers following safeguards that are in place to ensure maximum possible accuracy of reporting consumer information."  [Filing No. 186 at 23.]  It notes that "[t]his is especially true when the issue is whether a consumer is liable to repay a debt, because only furnishers are tasked with accurately reporting liability under the FCRA."  [Filing No. 186 at 23 (quotations, citations, and brackets omitted).]  Equifax asserts that it had no reason to believe that Ally was an unreliable furnisher and that "[o]n the contrary, Ally has a strong track record of providing the CRAs with accurate information about the status of its debts following a Chapter 7 bankruptcy."  [Filing No. 186 at 24.]  Equifax relies upon a sample of 300 consumers' bankruptcy files that were reviewed in connection with *Myers v. Equifax Info. Servs., LLC*, Case No. 1:20-cv-00392-JMS-DLP (S.D. Ind.), in which there was only one reporting error from Ally.  [Filing No. 186 at 24.]  It contends that "[the Dulworths'] suggestion that [the CRAs] should independently review all information provided by furnishers would be untenable and at odds with Congress's goal of creating a credit-

reporting system suitable for meeting the needs of commerce." [Filing No. 186 at 24 (quotation and citation omitted).]

In response, the Dulworths argue that the FCRA does not allow Equifax to "shirk [its] investigation responsibilities in favor of simply regurgitating what a furnisher tells the CRA about an account," and that Equifax took Ally's word over theirs, which was improper. [Filing No. 196 at 29.] They assert that just sending ACDVs to Ally was not reasonable and that Equifax was on notice that Ally was not a reliable furnisher through the Dulworths' "multiple, detailed disputes," and through the litigation in *Myers*, which they claim showed that "Ally did not know what it was doing when consumers entered into reaffirmation agreements with it." [Filing No. 196 at 30-31.] They argue further that the Court should consider whether Equifax knew Ally might be an unreliable source and what the cost to Equifax of verifying the accuracy of the information was, and note that "there is no discussion of whether any of [the] accounts [in the 300-account sample from *Myers*] involved reaffirmation agreements," and that Equifax "offer[s] nothing solid about [what] it would take to verify with Ally whether [the Dulworths'] agreements were valid." [Filing No. 196 at 32-33.]

In its reply, Equifax reiterates its argument that the Dulworths have not "provided any authority or evidence to show that Ally is an unreliable furnisher." [Filing No. 199 at 9.]

It is well-settled that a CRA can rely on information from a furnisher in order to reasonably assure maximum possible accuracy of its reporting of a consumer's information when the CRA has no reason to believe that the furnisher is unreliable. *Sarver*, 390 F.3d at 972 ("In the absence of notice of prevalent unreliable information from a reporting lender, which would put Experian on notice that problems exist, we cannot find that such a requirement to investigate would be reasonable given the enormous volume of information Experian processes daily.").

The Dulworths rely only on their own disputes and the dispute of the plaintiff in the *Myers* case for their argument that Ally was an unreliable furnisher. But issues with the Dulworths' Ally Loan, a potential inaccuracy with the plaintiff's loan in *Myers*, and one discrepancy out of 300 consumers in the *Myers* sample do not rise to the level of putting Experian on notice of a problem. Further, even if the 300-account sample in *Myers* did not include many, or any, scenarios where the consumer had entered into a reaffirmation agreement, the Court does not find this significant. The Dulworths still have not shown that there was an issue with Ally's reporting of accounts – reaffirmation agreement-related or otherwise – that should have alerted Equifax to an issue.

Further, the Dulworths do not suggest what more Equifax could have done. Even if it had examined the Bankruptcy Court docket upon receiving reinvestigation information from Ally, the docket would not have reflected whether the Reaffirmation Agreement was properly signed by the Dulworths and Ally, whether the Dulworths complied with the terms of the Reaffirmation Agreement up to that point such that it continued to be effective, or whether the Dulworths had rescinded the Reaffirmation Agreement after it was filed.

In sum, no reasonable jury could conclude that Equifax failed to follow reasonable procedures to assure maximum possible accuracy of its reporting of the Ally Loan. Accordingly, the Court **GRANTS** the CRAs' Joint Motion for Summary Judgment, [Filing No. 180], on the Dulworths' claims that Equifax negligently and willfully violated § 1681e(b).

### 3.   *Whether Equifax Violated § 1681i*

In support of its Joint Motion for Summary Judgment, Equifax argues that it did not violate § 1681i because the Dulworths' disputes involved a legal issue and "no amount of investigation by Equifax would have uncovered an inaccuracy in their credit reports." [Filing No. 186 at 25.] It asserts that after receiving the Dulworths' disputes – which included a copy of the Reaffirmation

Agreement – it did not know "whether the reaffirmation contract was enforceable, what happened between 2018 and 2021, and how the account should report as of September 2021 as neither the documents nor the bankruptcy docket would have provided [it] with a current status, history, and payment information," so it reinvestigated the disputes with Ally.  [Filing No. 186 at 25-26.]

The Dulworths argue in their response that Equifax simply took Ally's word over theirs regarding the validity of the Reaffirmation Agreement, and that a fact issue exists regarding the reasonableness of that conduct.  [Filing No. 196 at 29.]  They contend that courts have not found that the ACDV process is reasonable as a matter of law and that Equifax was on notice that Ally was an unreliable furnisher.  [Filing No. 196 at 30.]  The Dulworths assert that Equifax engaged in "parroting" by simply sending an ACDV to Ally and waiting for its response.  [Filing No. 196 at 33.]  They argue further that "Equifax has not moved for summary judgment on the willfulness element of [their] Section 1681i claim."  [Filing No. 196 at 44.]

In its reply, Equifax argues that "courts have held that the use of the ACDV process is sufficient when a plaintiff cannot show what a more robust reinvestigation would result in," and that "no amount of reinvestigation by Equifax would have allowed it to determine whether the reaffirmation agreement was legally valid or not because Equifax is not equipped to determine the validity of a debt and neither is it required to do so under the FCRA."  [Filing No. 199 at 8.]  Equifax argues that it did move for summary judgment on the Dulworths' claim that it willfully violated § 1681i, pointing to "an entire section dedicated to [the Dulworths'] failure to establish that Equifax violated Section 1681i of the FCRA."  [Filing No. 199 (citing Filing No. 186 at 15; Filing No. 186 at 25-26; Filing No. 185 at 29-33).]

As the Seventh Circuit has explained, "[w]hen a consumer contends that his [or her] credit report is inaccurate or incomplete, he [or she] can dispute his [or her] report with the CRA that

prepared it.  The CRA is then obligated to conduct a 'reasonable reinvestigation to determine whether the disputed information is inaccurate,' considering '[a]ll relevant information submitted by the consumer.'"  *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 809 (7th Cir. 2023) (citations omitted, quoting 15 U.S.C. § 1681i).  The CRA  must then transmit to the furnisher "all relevant information regarding the dispute" that it receives from the consumer.  15 U.S.C. § 1681i(a)(2)(A).  Negligent violations of § 1681i are actionable under § 1681o and willful violations are actionable under § 1681n.  *Chaitoff*, 79 F.4th at 809.   "[R]easonable procedures under § 1681e(b) are not proof of a reasonable reinvestigation under § 1681i(b)."  *Id.* at 817.

Here, Equifax received disputes from the Dulworths in which they stated that the Ally Loan should not be reporting as closed or included in bankruptcy, but rather that it was an open account that was reaffirmed in bankruptcy and had a positive payment history.  [*See* Filing No. 181-10; Filing No. 181-11; Filing No. 181-12; Filing No. 182-2.]  Equifax then sent ACDVs to Ally to reinvestigate the status of the Ally Loan.[4]  [*See* Filing No. 182-4.]  Further, and tellingly, the Dulworths do not suggest what more Equifax could have done.  Although Equifax had a copy of the Reaffirmation Agreement, the mere existence of the Agreement did not necessarily mean that it was valid.  Its validity turned on whether it was validly signed, whether the Dulworths had continued with timely payments, and whether the Dulworths had repudiated the Agreement (as they were permitted to do pursuant to bankruptcy laws).  As discussed above, these are legal determinations that Equifax was not obligated to make under the FCRA, rather than factual determinations that were readily made from looking at the bankruptcy docket.  *Chaitoff*, 79 F.4th

---

[4] The Court acknowledges that Equifax did not contact Ally via ACDV in connection with Brianna Dulworth's September 2021 Dispute, but an Equifax agent did address the Ally Loan and confirmed that it was reporting as included in bankruptcy.  [Filing No. 183-1 at 22-23.]  And the Dulworths do not discuss in their response brief Equifax's failure to use the ACDV process in connection with Brianna Dulworth's September 2021 Dispute in any event.

at 814 ("CRAs are not well suited to adjudicate legal defenses to a debt, so they are not liable for reporting information that may be legally inaccurate.").  Additionally, and also as discussed above, the Dulworths have not presented competent evidence from which a reasonable jury could conclude that Equifax should have known that Ally was an unreliable furnisher.

Further, while a CRA's duty to reinvestigate also depends on "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer," *Henson v. CSC Credit Servs.*, 29 F.3d 280, 287 (7th Cir. 1994), the appropriate answer was not – as the Dulworths suggest – for Equifax to simply delete the Ally Loan tradeline because doing so would not cost anything, [Filing No. 196 at 33].  Equifax reinvestigated the tradeline by submitting an ACDV to Ally and considering Ally's response.  While the ACDV process is not *per se* reasonable in every circumstance, the circumstances here did not require Equifax to do more.  The Dulworths premise their argument on the notion that Equifax had a duty to "figure out whether the reaffirmation agreement [was] valid," [Filing No. 196 at 21], but Equifax has no such duty under the FCRA when "figuring it out" would entail making legal determinations, as it would have here.  *See Denan*, 959 F.3d at 295.

Finally, the Court rejects the Dulworths' argument that Equifax did not move for summary judgment on their claim that Equifax willfully violated § 1681i.  Although Equifax focuses its motion on arguments that it did not violate § 1681i at all, [*see, e.g.*, Filing No. 186 at 25-26], it also states that it "move[s] for summary judgment on Plaintiffs' claims that [it] allegedly violated § 1681e(b) *and willfully violated § 1681e(b) and § 1681i* of the FCRA." [Filing No. 186 at 15 (emphasis added).]  And, in any event, the Court has found that no reasonable jury could conclude that Equifax violated § 1681i in the first instance, so it would be impossible to find that Equifax

violated that provision willfully.  *See Safeco*, 551 U.S. at 60 (whether FCRA was violated in the first instance was "antecedent question" to whether violation was reckless).

In sum, no reasonable jury could conclude that Equifax failed to reasonably reinvestigate the Dulworths' disputes in violation of § 1681i.  Accordingly, the Court **GRANTS** the CRAs' Joint Motion for Summary Judgment as to the Dulworths' claims against Equifax for both negligent and willful violations of § 1681i.

### III.
#### CONCLUSION

"In a nation of 330 million people, billions of pieces of credit information are generated each year.  Mistakes in compiling and reporting that information are inevitable."  *Chaitoff*, 79 F.4th at 808.  Moreover, the FCRA is not a strict liability statute.  *Walton*, 761 Fed. App'x at 592.  The Dulworths have not presented evidence from which a reasonable jury could conclude that Experian provided a credit report containing the inaccurate reporting of the Ally Loan to a third party, that the Dulworths suffered actual damages at the hands of Equifax, or that Equifax failed to satisfy its obligations to follow reasonable procedures to assure maximum possible accuracy of its reporting of the Ally Loan or to reasonably reinvestigate the Dulworths' disputes regarding the reporting of the Ally Loan.  For the foregoing reasons, the Court:

- **DENIES** the Dulworths' Motion to Exclude the Declaration of Karen Cobb, [198];

- **DISMISSES** the Dulworths' claims against Experian **WITHOUT PREJUDICE** for lack of jurisdiction;

- **DENIES AS MOOT** the CRAs' Joint Motion for Summary Judgment, [180], as to the Dulworths' claims against Experian; and

- **GRANTS** the CRAs' Joint Motion for Summary Judgment, [180], as to the Dulworths' claims against Equifax.

Final judgment shall enter accordingly.

Date: 5/22/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**